TOTAL CARE PHYSICIANS, P.A., and
Total Care Physicians, Glasgow,
P.A., Plaintiffs,

v.

Kevin W. O'HARA, M.D., Stuart Felzer,
M.D., Felzer Group, L.P., and Denise
Scott, Defendants.

C.A. No. 99C–11–201–JRS.

Superior Court of Delaware,
New Castle County.

Date Submitted: Feb. 6, 2001.
Date Decided: March 23, 2001.

Jeffrey S. Welch, Esquire, Welch & White, P.A., Wilmington, for Plaintiffs.

Charles M. Oberly, III, Esquire, Oberly & Jennings, Wilmington, for Defendants.

## MEMORANDUM OPINION

SLIGHTS, J.

### I. INTRODUCTION

This controversy arises from the often ugly sequelae of professional separation.

Plaintiffs, Total Care Physicians, P.A. and Total Care Physicians Glasgow, P.A. (collectively "TCP"), have sued defendant, Kevin W. O'Hara, M.D. ("O'Hara"), after O'Hara severed his professional relationship with TCP to pursue opportunities elsewhere. TCP has also sued one of its former secretaries, Denise Scott ("Scott"), for her alleged assistance of O'Hara in his efforts to secure the continued patronage of his TCP patients at his new medical practice. Finally, and not surprisingly, TCP has sued Stuart Felzer, M.D. ("Felzer"), the physician with whom O'Hara joined after departing TCP, and Millcreek Associates P.A. ("Millcreek"), the medical practice created by Felzer and O'Hara more than one year after they associated with each other. The parties have filed cross motions for summary judgment. The motions overlap, are fact-intensive, and rely upon a record peppered with invective. The Court's first reaction to the cross motions is to throw up its hands and allow the parties to continue their "slug fest" before a jury.[1] Of course, in the face of cross motions for summary judgment, the Court cannot abrogate its responsibility to review the evidence of record, apply the applicable law to undisputed facts, and determine whether either party is entitled to judgment as a matter of law. The Court has performed this function and its decision on the cross motions for summary judgment follows.[2]

## II. FACTS

### A. O'Hara's Relationship With and Departure From TCP

O'Hara's relationship with TCP is governed by a letter agreement dated June 2, 2001 (the "Contract").[3] In the Contract, the parties agree that O'Hara will perform physician services for TCP as an independent contractor.[4] Of particular importance to this dispute are the provisions of the Contract which address the termination of the parties' relationship. The relevant provisions follow:

> 4. It is intended that this Agreement shall continue for approximately three and a half years, through the 30th day of June 1996. However, this agreement may be terminated prior to that time upon the mutual written consent of both parties. Furthermore, on or before December 30 of each calender year (beginning with December 30, 1995), either party may give written notice of intention to terminate this Agreement on July 1 of the following calender year. Barring such notices, this

1. A review of the record reveals that the litigation to date has been quite contentious, at least as between the parties.

2. The matter was initially assigned to this judge's predecessor. It was then reassigned temporarily to another judge of this court to whom briefs were submitted and before whom oral argument was presented. The case has now been assigned to this judge for final disposition. The Court apologizes to the parties and to counsel for the frustrating "shuffle" to which this case has been subjected. After careful consideration by the Court, it was determined that the cross motions should be decided by the same judge who will try the case if trial is necessary. Hence the decision to submit the cross motions to this judge for disposition.

3. The parties acknowledge that the Contract is valid and that it must be the focal point of the Court's analysis of the cross motions, at least with respect to the contract-based claims.

4. Both parties have referred to the Contract between O'Hara and TCP as an "employment contract." The Court rejects this characterization of the parties' relationship for the simple reason that it contradicts the express terms of the Contract.

Agreement will continue from year-to-year.

6. At the termination of this agreement, for any reason, you agree not to conduct a private practice in any manner in New Castle County, Delaware for a period of two years after any termination, unless you pay a fee of $200,000.00 to Total Care Physicians, P.A. beforehand, for introducing you to the community.

11. T.C.P. will discuss with you, no later than December 30, 1995, and offer you financial interest in T.C.P. similar to any offer accepted by other T.C.P. shareholders at that time. This offer will represent a percentage share of ownership at least equal to that held by other junior shareholders of T.C.P. at that time. If such an offer is not made to you, you may terminate this agreement as provided herein, except that paragraph 6 of this agreement will then be null and void and you may conduct a private practice where you so please except within a radius of 3,000 feet of any of the three present T.C.P. offices. The 3,000 feet restriction shall apply for only a period of two years after such termination. (*Id.*)

At some point during 1994 or 1995, O'Hara began to consider leaving TCP in order to pursue other professional opportunities at the conclusion of the Contract term. He began seriously to discuss one such opportunity with Felzer in July, 1995. At the time, Felzer was engaged in a solo general medical practice. His patient load had become larger than one physician could manage. Felzer claims that his primary purpose in discussing an association with O'Hara was to distribute some of his existing clinical work to another physician; he was not seeking a physician with a thriving existing practice. Felzer and O'Hara exchanged a draft employment contract as early as October, 1995. It is undisputed that O'Hara was still under contract with TCP at this time and that he did not seek TCP's permission to discuss employment terms with Felzer. O'Hara and Felzer executed an employment contract on December 21st or 22nd, 1995, approximately seven days prior to O'Hara's notification to TCP that he did not intend to extend the Contract beyond its term. The effective date of the O'Hara/Felzer contract was between March 1, 1996 and July 2, 1996, depending upon when O'Hara actually departed from TCP.

By letter dated December 29, 1995, O'Hara provided the notice required by paragraph 4 of the Contract: "It is apparent that I am not going to be offered a financial interest in Total Care Physicians. Therefore, please be advised of my intention to terminate our agreement ... effective July 1, 1996." O'Hara delivered this letter to the office of Dr. Theodore Michell ("T. Michell") on the same day it was written, December 29, 1995, a Friday, at 4:00 P.M. T. Michell was the President of TCP.

O'Hara's notice is significant. It was delivered at the end of the last business day before December 30, 1995, the deadline by which either party was required to notify the other party of its intention to terminate the Contract as of June 30, 1996. Had O'Hara not delivered the notice by the prescribed deadline, the Contract automatically would have extended for another year, to June 30, 1997. (Contract, ¶ 4)

O'Hara's notice is significant for two other reasons. First, it confirms his understanding that TCP had not yet offered, and did not intend to offer him a financial interest in the practice. Absent such an offer by December 30, 1996, the Contract

provided that O'Hara was released from the restrictive covenant and liquidated damages set forth in paragraph 6 of the Contract. (Contract, ¶ 11) Second, O'Hara's notice confirms that his resignation from TCP was not effective until July 1, 1996, the day after the Contract, by its terms, expired.

The parties do not dispute that as of December 29, 1995, no one from TCP had offered, or even discussed an offer, of a financial interest in TCP with O'Hara as contemplated by paragraph 11 of the Contract. Remarkably, however, T. Michell testified that notwithstanding his silence during the first three years of his relationship with O'Hara, he did intend to offer a financial interest in TCP to O'Hara. According to T. Michell, he attempted to arrange a meeting with O'Hara throughout December, 1995 so that he could communicate the offer directly to O'Hara. The meeting was finally set for the early evening of December 29, 1995. O'Hara, however, did not show for that meeting. T. Michell testified that had O'Hara attended the meeting he would have received an offer of a 10% equity interest in TCP. Neither T. Michell nor anyone else on behalf of TCP did anything thereafter to communicate the offer to O'Hara by the December 30, 1996 deadline.

Felzer maintains that he would have released O'Hara from their contract had TCP offered O'Hara a financial interest in TCP and had O'Hara determined that he wanted to accept the offer. The record is silent with respect to how O'Hara would have responded had the offer been communicated to him.

### B. O'Hara Advises TCP Patients of His Departure

In late March or early April, 1996, O'Hara and Dr. Constantine Michell ("C. Michell") discussed how O'Hara's patients should be advised of his departure from TCP. The two doctors dispute the substance of that conversation. O'Hara contends that he was given unrestricted authorization to notify his patients that he was relocating his practice. C. Michell asserts that the authorization was limited to verbal notification of patients only when those patients came into the office for an appointment.

Although the parties dispute the extent of O'Hara's authority from TCP to notify patients of his departure, they do not dispute the means by which he actually did so. On June 17, 1996, O'Hara mailed the following letter to more than 900 TCP patients:

I am pleased to inform you that on July 1, 1996 I will be leaving Total Care Physicians to join Stuart Felzer in our new office .... You are receiving this letter because either we have an established relationship and/or you have selected me as your primary care physician (PCP) with your insurance plan. In order for me to continue as your PCP at my new location, the insurers require that *you* notify them directly. You *will not automatically* be transferred with me. Therefore, if you wish to retain me as your PCP, please contact your member services number listed below and inform them of your intentions *as soon as possible.* * * * Failure to do so may result in problems with insurance coverage for office visits.

Also, Total Care Physicians will require a signed request in order to forward your records to my new office. Therefore, I have included a records request form for that purpose. (emphasis in original)

O'Hara readily acknowledges that he did not discuss this letter or its contents with any officer or employee of TCP prior to mailing it. O'Hara also acknowledges that

the letter was accompanied by a medical records release form which was intended to facilitate the transfer of patient charts from TCP to O'Hara's new practice. Several weeks later, TCP transferred 676 patient records to O'Hara in accordance with the directions of the medical authorization forms O'Hara had supplied to his patients.

### C. Denise Scott Assists O'Hara Gather Patient Information

TCP also employed Scott, from January, 1993 until December, 1997, in various supportive capacities which included reception and office management duties. At some point during the second half of 1995, Scott was instructed by O'Hara to photocopy several patient "super bills." A "super bill" is a written collection of patient data, including the patient's diagnosis, certain insurance procedure and diagnoses codes and, most importantly, the patient's address. The exact number of super bills copied by Scott is unknown although it appears the number is, at least, several hundred. She ceased copying the documents sometime around November or December of 1995. O'Hara did not advise Scott of his purpose in compiling these records, and the record is devoid of other evidence indicating that Scott was purposefully assisting O'Hara in his efforts to secure patient information for the purpose of transitioning the patients to his new practice. O'Hara was her supervisor and she did as she was told.

In late 1997, more than a year after O'Hara's departure from TCP, Scott answered an apparently anonymous employment advertisement in which Felzer and O'Hara sought a referral specialist. The record indicates that her response to this "want ad" was simply a coincidence (albeit a remarkable one); there is no evidence that Felzer or O'Hara actively solicited Scott to leave TCP to join their practice. Scott continued to work at TCP until December, 1997, at which time she left TCP to work for O'Hara and Felzer beginning in January, 1998. When she left TCP, she took with her an office Rolodex. The Rolodex contained insurance information, insurance contacts, and referral information. Scott took the Rolodex with her to her new position to assist with her referral duties. She believed the information belonged to her, not to TCP. Indeed, the information in the Rolodex was compiled by her over the course of several years, and included information she had gathered prior to joining TCP. In January, 1998, a TCP representative contacted Scott and requested that she return the Rolodex to TCP, which she did shortly thereafter. Prior to returning the Rolodex, Scott made a complete copy of the information, and she continuously used that information while working for O'Hara and Felzer at Millcreek.

### D. Felzer Denies Knowledge of O'Hara's Patient Solicitations

Felzer has testified that he was not aware of O'Hara's efforts to bring patients with him to Felzer's practice. From Felzer's perspective, O'Hara was coming to assist him with a patient load which was getting too big for him to handle alone. Felzer also maintains that he did not interfere with O'Hara's relationship with TCP since the O'Hara/Felzer contract was not effective until July 1, 1996, the day after O'Hara's Contract with TCP expired. Neither of the Drs. Michell could point to any evidence to contradict Felzer's denials.

### E. The Parties' Cross Motions

Plaintiffs have moved for partial summary judgement as to Count II, breach of contract; Count III, civil conspiracy; Count IV, theft of confidential proprietary information by defendant Denise Scott; Count VI, misappropriation of trade secrets; and Count VII, breach of fiduciary

duty. Plaintiffs also seek prejudgment interest, post-judgement interest, costs, and reasonable attorney's fees.

O'Hara has moved for summary judgment as to the breach of contract claim asserted against him (Count II). Scott, Felzer, and Millcreek have moved for summary judgment on plaintiffs' unjust enrichment claim (Count I), civil conspiracy claim (Count III), theft of information claim (Count IV), unfair competition claim (Count V), and misappropriation of trade secrets claim (Count VI).

## III. DISCUSSION

While the parties' cross motions for summary judgment address all but one of the plaintiffs' claims, their submissions and presentations at oral argument focused primarily upon the breach of contract claim and the misappropriation of trade secrets claim. Indeed, at oral argument, counsel for TCP acknowledged that "[t]he real issue is breach of contract. . . ." (Tr. at 19). Accordingly, the Court will address the "showcase" claims (Counts II & VI) first, out of the order they are raised in the Second Amended Complaint. The Court will then address the remaining claims *seriatim*. But first, the Court will recite the oft-repeated standards by which these cross motions must be considered.

### A. Standard of Review

In considering a motion for summary judgment, the Court is required to examine the record, all pleadings, affidavits and discovery.[5] The Court must view this evidence in the light most favorable to the non-moving party.[6] Summary judgment may be granted only when the Court's review of the record reveals that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law.[7]

The standard for summary judgment "is not altered because the parties have filed cross-motions for summary judgment."[8] Moreover,

the existence of cross motions for summary judgment does not act *per se* as a concession that there is an absence of factual issues. Rather, a party moving for summary judgment concedes the absence of a factual issue and the truth of the nonmoving party's allegations only for the purposes of its own motion, and does not waive its right to assert that there are disputed facts that preclude summary judgment in favor of the other party. Thus, the mere filing of a cross motion for summary judgment does not serve as a waiver of the movant's right to assert the existence of a factual dispute as to the other party's motion.[9] (internal citations omitted)

### B. Count II, The Breach of Contract Claim

TCP and O'Hara have both moved for summary judgement on Count II, the breach of contract claim. TCP avers that

**5.** *Oliver B. Cannon & Sons, Inc. v. Dorr–Oliver, Inc.,* Del.Super., 312 A.2d 322, 325 (1973).

**6.** *See United Vanguard Fund, Inc. v. Takecare, Inc.,* Del.Supr., 693 A.2d 1076, 1079 (1997); *Brzoska v. Olson,* Del.Supr., 668 A.2d 1355, 1364 (1995).

**7.** *Dale v. Town of Elsmere,* Del.Supr., 702 A.2d 1219, 1221 (1997).

**8.** *Haas v. Indian River Vol. Fire Co.,* Del.Ch., C.A. No. 1785, Steele, V.C., 2000 WL 1336730 (Aug. 14, 2000), Mem. Op. at 10 (citing *United Vanguard,* 693 A.2d at 1079).

**9.** *United Vanguard,* 693 A.2d at 1079 (citations omitted).

it is entitled to the $200,000.00 liquidated damages under paragraph 6 of the Contract, by virtue of O'Hara wrongfully joining a medical practice with Felzer which competed with TCP. TCP further asserts that O'Hara's letter dated December 29, 1995, effectively terminated the Contract between the parties, thereby relieving them of the duty to offer O'Hara a financial stake in TCP under paragraph 11. According to TCP, absent the remedial provisions of paragraph 11, the proscriptions set forth in paragraph 6, including the liquidated damages provision, remained in full force and effect. Because O'Hara terminated the contract, left TCP and subsequently established a competing medical practice within New Castle County, TCP contends that it is entitled to the liquidated damages to which both parties agreed would be appropriate under the circumstances now present.

O'Hara does not quarrel with TCP's interpretation of paragraph 6. Instead, O'Hara focuses on paragraph 11 and contends that TCP's admitted failure to offer him a financial interest in TCP by December 30, 1995, relieves him of his responsibility to pay liquidated damages. TCP responds by noting that O'Hara had resigned his post with TCP prior to December 30 and, therefore, any offer to O'Hara under paragraph 11 would have been superfluous. It contends that O'Hara cannot rely upon paragraph 11 to excuse him from paying liquidated damages when he had already indicated his intention to leave TCP and, by so doing, had indicated his likely rejection of a financial interest in TCP.

The Contract provisions at issue here are clear and unambiguous; they will be applied in accordance with their express terms.[10] In particular, the language of paragraph 11 is quite clear: since TCP at no time offered a financial interest in TCP to O'Hara, the language of paragraph 6, including the restrictive covenant and the liquidated damages clauses, became "null and void." It follows, then, that O'Hara is not obligated under the Contract to pay TCP liquidated damages.

■ TCP's frustration at this outcome is understandable. According to T. Michell, TCP intended to offer a financial interest in the practice to O'Hara but was unable to do so directly, i.e., in person to O'Hara, by the December 30 deadline. O'Hara may have been avoiding the other physicians at TCP during December, 1995 in order to make the communication of the offer more difficult. Moreover, O'Hara had tendered his resignation on December 29 and thereby had indicated his likely response to the offer if it had been made. The language of paragraph 11, however, does not contemplate the manner by which the offer would be communicated, nor does it require that O'Hara first indicate his intention to accept the offer in order to avail himself of the contractual forgiveness from liquidated damages. Instead, the Contract simply states that if an offer to take a financial interest in TCP is not made to O'Hara by December 30, 1995, he is free to compete with TCP without financial penalty. TCP did not make any such offer to O'Hara. Consequently, liquidated damages are not available.

The timing of O'Hara's letter of resignation does not alter the analysis. O'Hara

---

10. *See, e.g., Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.,* Del.Supr., 702 A.2d 1228, 1232 (1997); *Rhone–Poulenc Basic Chem. Co. v. American Motorists Ins. Co.,* Del.Supr., 616 A.2d 1192, 1195 (1992); *Hallowell v. State Farm Mut. Auto. Ins. Co.,* Del.Supr., 443 A.2d 925, 926 (1982)("[I]f the language [of a contract] is clear and unambiguous a Delaware court will not destroy or twist the words under the guise of construing them.")

arguably delivered the letter at the latest practicable time in order to avoid a one year extension of the Contract (with no offer of partnership in hand). The Contract required notice of termination to be delivered by December 30, 1995, or the Contract would be extended an additional year (to June 30, 1997). December 30 fell on a Saturday. O'Hara delivered his resignation letter on Friday, December 29 at 4:00 p.m. As of that time he had not received an offer to participate financially in the practice. Importantly, the resignation was not effective until June 30, 1996. O'Hara, therefore, was to remain a physician at TCP through the contemplated term of the Contract. Clearly, TCP could have delivered an offer—either orally or in writing—to O'Hara later on December 29 or on December 30. It did not do so. Whether O'Hara simply played the game better than TCP by carefully following the clear and unambiguous directions of the Contract or, more likely, TCP failed to appreciate the circumstances it was confronting in these critical final days of December, the fact is that O'Hara adhered to the terms of the Contract and TCP did not. Summary judgment will be entered for O'Hara on Count II.[11]

## C. Count VI, Misappropriation of Trade Secrets

TCP has alleged that O'Hara's efforts to facilitate the transfer of his TCP patients to his new practice resulted in the wrongful misappropriation of TCP trade secrets, namely, patient lists, patients charts, a Rolodex and other patient-related information. All parties (except O'Hara) have moved for summary judgment in their favor on this claim. For the reasons that follow, the Court concludes that neither O'Hara nor TCP is entitled to summary judgment on Count VI. With respect to Felzer, Scott, and Millcreek, however, the Court concludes that the record is devoid of evidence that they "misappropriated" a trade secret and, therefore, summary judgment as to them must be granted on this claim.

Under 6 *Del. C.* § 2003, a person or entity may recover damages, upon complaint, when they fall victim to a "misappropriation" of "trade secrets." A "trade secret" is:

[I]nformation, including a formula, pattern, compilation, program, device, method, technique or process, that:

a. Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

b. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.[12]

"Misappropriation" is defined as:

a. Acquisition of a trade secret of another by a person who knows or has reason to know that the secret was acquired by improper means; or

b. Disclosure or use of a trade secret of another without express or implied consent by a person who:

1. Used improper means to acquire knowledge of the trade secret; or

---

**11.** Since the Court has determined that paragraph 6 of the Contract is not operative under the facts of this case, it need not address whether the restrictive covenant in that paragraph violates 6 *Del. C.* § 2707, which prohibits the enforcement of contractual provisions which limit the ability of doctors to practice in a geographical area.

**12.** *6 Del. C.* § 2001(4).

2. At the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade was:

A. Derived from or through a person who had utilized improper means to acquire it;

B. Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

C. Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use.... [13]

Chancellor Allen succinctly enumerated the relevant inquiry when determining whether a plaintiff has set forth a *prima facie* misappropriation of trade secrets claim:

(1) Does a trade secret exist, *i.e.*, have the statutory elements—commercial utility arising from secrecy and reasonable steps to maintain secrecy been shown; (2) Has the secret been communicated by plaintiff to the defendant; (3) Was such communication pursuant to an express or implied understanding that the secrecy of the matter would be respected; and (4) Has the secret information been improperly (*e.g.* in breach of the understanding) used or disclosed by the defendant to the injury of the plaintiff.[14]

These criteria guide the Court's analysis here.

### 1. The Super Bills and Patient List

Two decisions of note from the Court of Chancery have examined whether patient information in a medical practice will be afforded trade secret protection under § 2001(2)(4). In *Marsico v. Cole*,[15] then Vice Chancellor Chandler confronted the question in the context of a defendant dentist who had departed from a dental practice with various patient information and files. These items included x-ray films and patient charts, as well as patient lists compiled and maintained by the practice and gummed address labels derived from the patient lists. As to the patient charts and x-ray films, the court emphasized that the defendant had not secured medical releases from the patients authorizing him to remove this information from the practice. Ultimately, the court held that the information removed from the practice by the defendant met the statutory definition of trade secret.[16]

In *Dickinson Medical Group, P.A. v. Foote*,[17] Chancellor Brown considered the trade secret implications when the defendant, Dr. Foote, left the plaintiff's medical practice following a contract dispute and took with her "an original computer printout setting forth the names and addresses of all patients of Dickinson treated by her during the period of her employment."[18] Dr. Foote also removed information regarding the amount charged by the Dickinson Medical Group for certain medical services. Plaintiffs sought to enjoin Dr. Foote from using the patient lists to contact her patients asserting that these lists were trade secrets as defined by § 2001(2). The Court observed that Dr. Foote "does not dispute that she surreptitiously misap-

---

13. 6 *Del. C.* § 2001(2).

14. *Wilmington Trust Co. v. Consistent Asset Mgt. Co.*, Del.Ch., C.A. No. 8867, Allen C., 1987 WL 8459 (Mar. 25, 1987), Mem. Op. at 8 (citations omitted).

15. Del.Ch., C.A. No. 13104, Chandler, V.C., 1995 WL 523586 (Aug. 15, 1995)(Letter Op.).

16. *Id.* at 9–10.

17. Del.Ch., C.A. No. 834–K, Brown, C., 1984 WL 8208 (May 10, 1984)(Letter Op.).

18. *Id.* at 2.

propriated ... confidential information compiled by her former employer at what is said to be substantial expense ...."[19] The Court concluded that the patient lists were trade secrets and that plaintiff had demonstrated a likelihood of success in proving that Dr. Foote had misappropriated the information.

The patient information at issue in this case is different than the information at issue in both *Dickinson* and *Marsico*. Those cases involved the removal by the defendant doctor of actual patient lists, compiled by the practices for their own use, and patient charts (without medical authorizations or releases). In this case, O'Hara personally compiled a list of patients he had treated at TCP to whom he sent the letter announcing his departure from TCP and his anticipated relocation. He also secured the transfer of patient charts from TCP by medical release forms duly executed by TCP patients. Nevertheless, O'Hara's patient list and medical authorization forms were compiled from, *inter alia,* super bills maintained by TCP (as opposed to individual TCP employees) which contain valuable and important patient information. O'Hara and Scott both admit that Scott was instructed by O'Hara to photocopy these super bills in the months leading to O'Hara's departure from the practice. O'Hara admits that these copies were made without the express permission of TCP.

■ Although the precedent does not clearly establish, as Plaintiffs contend, that O'Hara and Scott misappropriated trade secrets by copying the super bills, the Court concludes that the super bills do contain the sort of proprietary information which courts in Delaware have concluded justify "trade secret" status and protection. Specifically, they compile patient addresses, medical diagnoses and treatment codes, and specific patient insurance information, all of which are valuable data in the commercial operation of a medical practice, and all of which are generally unavailable in the public domain.

■ Having concluded that the super bills are trade secrets, the Court must next consider whether a determination that O'Hara and/or Scott misappropriated the information can be made as a matter of law. On this point, at least with respect to O'Hara, the record is replete with controversy. O'Hara claims that he was given express permission to effect a transition of his TCP patients to his new practice. TCP denies that such permission was granted to O'Hara. According to TCP, O'Hara's efforts to develop a list of his patients and then to contact them were covert and unauthorized. This dispute of fact, alone, is sufficient to defeat summary judgment for either party. Specifically, the Court is unable to determine as a matter of law whether O'Hara "used improper means to acquire" the information, or whether the circumstances by which the information was acquired "giv[e] rise to a duty to maintain its secrecy or limit its use."[20] Nor can the Court conclude on this record that TCP took reasonable steps to maintain the secrecy of the information.[21] A jury will decide these factual issues. The motion for summary judg-

---

19. *Id.* at 5.

20. 6 *Del. C.* § 2001(2). "Improper means" is defined as including "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." *See* 6 *Del. C.* § 2001(1)

21. *See Dionisi v. DeCampli,* Del.Ch., C.A. No. 9425, Steele, V.C., 1995 WL 398536 (June 28,. 1995), Mem. Op. at 21–22 (finding design firm's failure to incorporate reasonable measures to ensure the secrecy of its Rolodex precluded a claim of misappropriation of trade secrets when employee removed Rolodex upon leaving the firm).

ment with respect to O'Hara's conduct must be denied.

■ On the other hand, the record relating to the conduct of Scott and Felzer is not in dispute. Both Felzer and Scott have offered sworn testimony that they were not aware that O'Hara had used the super bills, or any other TCP information, to contact patients. This testimony has not been rebutted by TCP. On a motion for summary judgment, once the moving party has supported its motion with competent evidence, "the burden shifts to the non-moving party to substantiate its adverse claim by showing that there are material facts in dispute."[22] "It is not enough for the opposing party merely to assert the existence of . . . a disputed issue of fact."[23] Here, TCP has failed to sustain its burden to meet Felzer's and Scott's properly supported motion for summary judgment with any evidence to create an issue of material fact regarding their knowledge of, much less participation in, the alleged misappropriation of the super bills. Consequently, to the extent Count VI is predicated upon a misappropriation of this information, summary judgment is granted in favor of Felzer and Scott. Summary judgment must also be granted in favor of Millcreek as there is no evidence in the record to suggest that the practice was aware of the alleged misappropriation, or that the practice was the direct beneficiary of the information after O'Hara arrived.[24]

## 2. The Rolodex

■ Turning to the Rolodex taken by Scott, TCP, through its business manager, has alleged that it contained "the names and addresses of numerous insurance companies, health maintenance organizations, and contacts established by Total Care Physicians." TCP maintains that this information is "invaluable to the daily operations of plaintiff's medical practice and when placed in the hands of competition or other medical practitioners, would enable that medical practice to gain a substantial advantage in the medical community." For her part, Scott does not dispute that she removed the Rolodex from TCP when she left to work for O'Hara and Felzer. Nor does she dispute that she made copies of the information contained in the Rolodex before she returned it to TCP.

Returning to the statutory definition of "trade secret," the Rolodex clearly is a "compilation" of information.[25] The evidence of record, however, reflects that the Rolodex contained only the names of insurance companies, HMO's and contacts within these organizations. TCP has not indicated how this information is not available elsewhere, e.g., a telephone call (from a number obtained in the phone book or directory assistance) to the carriers or HMO's themselves. While the Rolodex may have made Scott's job a little easier when she arrived at Millcreek, it did not provide her with information which was unavailable elsewhere.[26]

Moreover, Scott testified that she believed the Rolodex—a compilation of information she alone gathered over the years—was her's to take. She had compiled the information contained in the

---

**22.** *Brzoska,* 668 A.2d at 1364.

**23.** *Id.*

**24.** Indeed, Millcreek did not come into existence until over a year after O'Hara notified his patients that he was leaving TCP.

**25.** 6 *Del. C.* § 2001(4).

**26.** *See Dionisi,* supra, Mem. Op. at 20–21 (noting that Rolodex contained information readily available from other sources and, consequently, its contents were not trade secrets).

Rolodex over a period of several years, including a period which preceded her employment with TCP. According to Scott's sworn testimony, TCP gave her no reason to think otherwise. TCP has not rebutted this sworn testimony with competent evidence that it maintained any protocols with respect to confidentiality or otherwise took measures to protect its Rolodex information.[27] Summary judgment for Scott on Counts IV and VI will be granted. As to O'Hara, Felzer and Millcreek, to the extent Court VI is predicated upon misappropriation of the Rolodex, summary judgment will be entered in their favor as well.

### D. TCP's Remaining Claims

#### 1. Count I, Unjust Enrichment

Felzer, Scott and Millcreek have moved for summary judgment on TCP's unjust enrichment claim. The essence of TCP's unjust enrichment claim is that the defendants unlawfully misappropriated TCP information and with that information unlawfully solicited TCP patients.

■■■ Unjust enrichment is "the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience."[28] "The elements of unjust enrichment are: (1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and the impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law."[29]

■■■ The Court cannot conclude on this record that any evidence has been elicited to suggest that either Felzer or Scott personally have been enriched at all, much less unjustly enriched by the alleged misappropriation of TCP trade secrets or wrongful solicitation of TCP patients. Enrichment, of course, is a predicate to recovery on this theory. Summary judgment for Felzer and Scott, therefore, will be granted.

■■■ As to Millcreek, the record does not allow the Court to conclude, as a matter of law, one way or the other whether an unjust enrichment has occurred. The practice was not established until well over a year after O'Hara left TCP. It is unlikely, then, that Millcreek was enriched by the alleged misappropriation of TCP trade secrets, particularly in view of O'Hara's testimony that the information he took from TCP was lost shortly after he left TCP. But the evidence also reveals that TCP continued to alert Millcreek of its view that Millcreek wrongfully was soliciting TCP patients after Millcreek was formed. TCP has gone to great lengths to establish the financial benefits derived by Millcreek from this wrongful solicitation. The jury will sort through this factual controversy as it considers whether O'Hara has been unjustly enriched at the expense of TCP.[30]

#### 2. Count III, Civil Conspiracy

■■■ The elements of civil conspiracy are "1) a confederation or combination

---

27. See Brzoska, 668 A.2d at 1364 (addressing non moving party's burden on summary judgment). See also, 6 Del. C. § 2001(4); Dionisi, supra, Mem. Op. at 21–22 (lack of effort to protect information precludes claim of misappropriation of trade secret).

28. Fleer Corp. v. Topps Chewing Gum, Inc., Del.Supr., 539 A.2d 1060, 1062 (1988) (citation omitted).

29. Jackson Nat'l Life Ins. Co. v. Kennedy, Del. Ch., 741 A.2d 377, 393 (1999) (citations omitted).

30. Neither TCP nor O'Hara have moved for summary judgment on the unjust enrichment claim, apparently in recognition of the disputed issues of fact which surround it.

of two or more persons; 2) an unlawful act done in furtherance of the conspiracy; and 3) actual damages."[31] "[C]ivil conspiracy is not an independent cause of action in Delaware, ... it must arise from some underlying wrong."[32] Having concluded that neither Felzer nor Scott engaged in wrongful conduct, TCP's conspiracy claim must fail.[33]

The claim must fail for another reason. The factual predicate of plaintiff's civil conspiracy claim mirrors the facts alleged to have constituted a misappropriation of trade secrets. Indeed, TCP has acknowledged in its papers that "the underlying wrong which defendants O'Hara and Felzer, Millcreek Associates, and defendant Denise Scott's conspiracy [sic] is that they blatantly violated Delaware law by misappropriating plaintiff's trade secrets, proprietary information, customer lists and other proprietary information." (TCP Op. Br. at 24) TCP apparently did not consider all provisions of the Delaware Uniform Trade Secrets Act ("the Act") when it constructed its complaint. Specifically, at Section 2007(a),[34] the Act provides that its recognition of a statutory cause of action for misappropriation of trade secrets "displaces conflicting tort ... law of this State pertaining to civil liability for misappropriation of a trade secret...." Thus, it has been recognized that "[Section] 2007 was intended to preserve a single tort cause of action under state law for misappropria-

tion... and ... to eliminate other tort causes of action founded on allegations of trade secret misappropriation."[35] Summary judgment will be granted as to all defendants on Count III.

### 3. Count IV, Theft of Proprietary Information by Scott

▆ For the same reasons Scott is entitled to summary judgment on Count VI (misappropriation of trade secrets), she is also entitled to summary judgment on Count IV. TCP has not established that Scott knew of O'Hara's purpose when she copied the super bills at his direction, nor have they established that the Rolodex she had compiled constituted proprietary information of the practice. Moreover, this claim is displaced by TCP's claim of misappropriation of trade secrets.[36] Summary judgment will be granted to Scott on Count IV.

### 4. Count V, Unfair Competition

▆ Felzer, Scott and Millcreek seek summary judgment on TCP's unfair competition claim. "The elements of the tort of unfair competition are that the plaintiff has a reasonable expectancy of entering a valid business relationship, with which the defendant wrongfully interferes, and thereby defeats the plaintiff's legitimate expectancy and causes him harm."[37] Once again, at least as to Felzer and Scott,

---

**31.** *S & R Assocs. v. Shell Oil Co.*, Del.Super., 725 A.2d 431, 440 (1998)(citing *Nicolet Inc. v. Nutt*, Del.Supr., 525 A.2d 146, 149–50 (1987)).

**32.** *Ramunno v. Cawley*, Del.Supr., 705 A.2d 1029, 1039 (1998) (citation omitted).

**33.** *Interim Health Care v. Fournier*, Del.Ch., C.A. No. 13003, Jacobs, V.C., 1994 WL 89007 (Feb. 28, 1994), Mem. Op. at 17 n. 18 (court rejected claim of misappropriation of trade secrets and thereafter concluded that conspiracy claim must fail); *Nicolet*, 525 A.2d at 150.

**34.** 6 *Del. C.* § 2007.

**35.** *Leucadia, Inc. v. Applied Extrusion Techs., Inc.*, D.Del., 755 F.Supp. 635, 637 (1991).

**36.** *Id.*

**37.** *Rypac Packaging Mach. Inc. v. Coakley*, Del.Ch., C.A. No. 16069, Jacobs, V.C., 2000 WL 567895 (May 1, 2000), Mem. Op. at 26 (citations omitted).

the Court finds no evidence in the record which supports the notion that either individual "wrongfully interfered" with TCP's expected business relationships. And, once again, the Court concludes that the claim is preempted by TCP's trade secrets claim.[38] As the preemption analysis applies to all defendants, as a matter of statutory law,[39] summary judgment will be granted as to all defendants on Count V.

### 5. Count VII, Breach of Fiduciary Duty

TCP alleges in Count VII that O'Hara breached fiduciary duties owed to TCP by: (1) ordering Scott to copy "superbill" information; (2) compiling a list of patient information; and (3) soliciting TCP patients to follow him to his new practice. TCP has moved for summary judgment on this Count but has failed to address this aspect of its motion in any of its submissions. While the Court's first inclination is to likewise ignore the breach of fiduciary duty claim, the Court is compelled to address it in the interest of judicial economy so that it will not resurface unattended later in these proceedings.

 As a general proposition under Delaware law, only certain legal relationships will give rise to fiduciary duties among the parties involved. The concept of fiduciary duty arose in courts of equity primarily to deal with relationships, such as those created by trust agreements and corporate governance structures, where the legal ownership of property was separated from the equitable interest held by the beneficiary or true owner.[40] Delaware courts have extended the concept and now generally recognize that a fiduciary relationship will arise " 'where one person reposes special confidence in another, or where a special duty exists on the part of one person to protect the interests of another, or where there is a reposing of faith, confidence, and trust, and the placing of reliance by one person on the judgment and advice of another.' "[41] Duties of a fiduciary character will only be imposed where the relationship or trust can be characterized as "special;"[42] fiduciary duties will not be imposed in the midst of typical arms-length business relationships.[43]

O'Hara, as the parties recognize, is an independent contractor of TCP. The fact that the contract between the parties contemplated the eventual extension of an equity interest to O'Hara does not alter the nature of the parties' relationship at the time O'Hara allegedly breached fiduciary duties owed to TCP. While at first glance this relationship would appear to be a "straightforward commercial relationship arising from contract," and therefore removed from fiduciary responsibilities, the record reveals that an "element of confidentiality" was woven into the fabric of TCP's relationship with O'Hara.[44] O'Hara enjoyed unrestricted access to TCP's confidential patient information, billing information and medical charts (including the

---

**38.** *Leucadia,* 755 F.Supp. at 637 (finding that unfair competition claim was preempted by trade secrets claim).

**39.** *6 Del. C.* § 2707.

**40.** *McMahon v. New Castle Assoc.,* Del.Ch., 532 A.2d 601, 604 (1987) (citations omitted).

**41.** *Lank v. Steiner,* Del.Ch., 213 A.2d 848, 852 (1965)(quoting 36A C.J.S. Fiduciary p. 385).

**42.** *McMahon,* 532 A.2d at 604.

**43.** *Id.* (citing *Pennsylvania Co. v. Wilmington Trust Co.,* Del.Ch., 186 A.2d 751 (1962), *aff'd sub nom Wilmington Trust Co. v. Coulter,* Del. Supr., 200 A.2d 441 (1964)).

**44.** *See McMahon,* 532 A.2d at 604–05.

super bills upon which he relied to compile his patient list). O'Hara's status as an independent contractor does not diminish his duty of loyalty to the practice in the context of protecting trade secrets or confidential, proprietary information.[45]

 Whether O'Hara breached his duty of loyalty to TCP is a question of disputed fact. In this regard, the Court must first address a fundamental evidentiary matter relating to this claim. The fiduciary duty which the Court has found O'Hara owed to TCP ceased on the day he left the practice.[46] Accordingly, the evidence probative of the alleged breach of this duty will be limited to O'Hara's conduct while still under Contract with TCP. O'Hara has alleged that his conduct in securing patient names and advising them that he was leaving the practice was expressly authorized by TCP and, in any event, that such conduct was consistent with his ongoing obligations to his patients. TCP vehemently denies that O'Hara's conduct was authorized or otherwise reasonable. The jury will determine which party should prevail on this claim.

### III. CONCLUSION

By its holdings today, the Court has substantially pared down the claims to be tried to the jury. The motions for summary judgment of Scott and Felzer individually are **GRANTED**, and all claims against them are hereby dismissed. As to Millcreek, the Court has **GRANTED** summary judgment in its favor on Counts III, V and VI, leaving only Count I for the jury. Finally, as to O'Hara, the Court has **GRANTED** summary judgment in his favor on Counts II, III, and V, leaving Counts I, VI and VII for the jury. TCP's

cross motion for summary judgment is **DENIED**.

**IT IS SO ORDERED.**

---

**45.** *Marsico,* supra, Letter Op. at 5–7.

**46.** *Dionisi,* supra, Mem. Op. at 17–19 (Court concluded that fiduciary duty ended when the

defendant employee/officer resigned from the plaintiff's firm).