# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| HOWARD G. HAMPTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. N16C-03-196 VLM |
| | ) | |
| TITAN INDEMNITY COMPANY, | ) | |
| | ) | |
| Defendant/Third-Party Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CHERYL BROWN, | ) | |
| | ) | |
| Third-Party Defendant. | ) | |

## MEMORANDUM OPINION & ORDER

Submitted: June 5, 2017
Decided: June 23, 2017

*Upon Consideration of Defendant/Third-Party Plaintiff's Motion for Summary Judgment,* **DENIED.**

*Upon Consideration of Plaintiff/Third-Party Defendant's Motion for Summary Judgment,* **GRANTED.**

Patrick Gallagher, Esquire, of Curley, Dodge, Funk & Street, LLC, of Dover, Delaware. *Attorney for Plaintiff & Third-Party Defendant.*

Roger K. Pearce, Esquire, of Reger, Rizzo & Darnall, L.L.P., of Wilmington, Delaware. *Attorney for Defendant/Third-Party Plaintiff.*

**MEDINILLA, J.**

## INTRODUCTION

This case probes the confines of "no-fault" Personal Injury Protection ("PIP") benefits under Delaware's Financial Responsibility Law, 21 *Del. C.* § 2118. It does so in two ways. First, Titan Indemnity Company ("Titan") contends that, "what's good for the goose is [not] good for the gander." Plaintiff Howard Hampton, someone with myriad convictions for driving under the influence, was injured while helping his platonic living companion, Third-Party Defendant Cheryl Brown, extricate her vehicle from a snowy ditch adjacent their mobile home. While steering her vehicle—coaxing it forward and backwards out of the ditch—he was struck by a negligently-operated snow plow traveling in the opposite direction on the two-lane country road. Were Mr. Hampton a stranger, a friend, a foe to Ms. Brown, or simply a Good Samaritan—or anyone else on the planet—he would be entitled to PIP benefits. But, Titan argues, his unique status as a "roommate" of the insured's "household" retroactively voids the insurance policy, prohibiting him from receiving PIP benefits for his injuries.

Titan's conclusion begets the second issue: whether Ms. Brown is responsible for failing to disclose Mr. Hampton as a "roommate" in a portion of the insurance application that requested the presence of other "drivers" in the household. The agent who issued her the application never asked Ms. Brown about any roommates with whom she lived. Equally, Ms. Brown did not read the

1

application before signing it. Remarkably, Titan concedes that even had the agent been told of Mr. Hampton, she would not have named him as a driver on the application because he was unlicensed. Nevertheless, Titan contends that Ms. Brown materially misrepresented Mr. Hampton's status as a roommate and potential driver of her vehicle. Titan asks to declare the policy null and void under 18 *Del. C.* § 2711 as a material misrepresentation.

Titan and Ms. Brown have cross-moved for summary judgment. After considering the parties' motions, responses, and oral arguments, the Court finds that the relevant portion of the insurance contract is fairly susceptible to two different interpretations: that Mr. Hampton was at once a "roommate" within the policy's definition of "household members," but not a "driver" as contemplated by the same section of the application. In light of this ambiguity, the doctrine of *contra proferentem* requires the contract be interpreted in favor of coverage. Therefore, the Court **DENIES** Titan's Motion for Summary Judgment and **GRANTS** Plaintiff/Third-Party Defendant's Motion for Summary Judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

### *Factual Background*

Titan underwrites insurance policies underneath the banner of Nationwide Insurance. It does so through several licensed but independent insurance agencies.

A to Z Insurance Company ("A to Z") is one such agency. The insurance policy at issue in this case was issued to Ms. Brown by A to Z and underwritten by Titan.

It is undisputed that Ms. Brown and Mr. Hampton co-inhabit a double-wide mobile home in Magnolia, Delaware. They pay separate rent to the landlord of the trailer, a relative of Ms. Brown's. They have their own private space, including their respective bathrooms and bedrooms. They share a common kitchen, living room, and dining room. They share utility expenses. Mr. Hampton performs yard work and household maintenance at the residence as a credit towards his rent. They purchase their own groceries and cook their own food. The two rarely speak to one another.

## A.    The Accident

On January 24, 2016, Ms. Brown was traveling home in her insured automobile. Her car became stuck in a snow ditch adjacent the road within two to three driveways of her residence. She called Mr. Hampton to help extricate the vehicle from the ditch. Mr. Hampton looked out of his trailer and walked over to assist her.

At first, Mr. Hampton and his sister—a passenger in the vehicle at the time it became stuck—pushed from behind the vehicle with Ms. Brown in the driver's seat. Their attempts failed. As cars in her original direction of travel began to stop and wait to pass, Mr. Hampton replaced Ms. Brown at the wheel. While he tried in

3

vain to move the vehicle out of the ditch, a passing snow plow careened into the car and injured him in the collision.

After the police arrived, Mr. Hampton was cited for driving without a license and without proof of insurance. Mr. Hampton has not had a driver's license for fifteen years, primarily as a result of Driving while Under the Influence ("DUI") offenses. In 2014, he was convicted of his fifth DUI, and was on probation at the time Ms. Brown applied for insurance through A to Z.

### B.    The Application

One month before the accident, on December 23, 2015, Ms. Brown sought to insure two of her vehicles and met with Kathleen Joyner, a licensed insurance agent at A to Z. The agent began the application by asking Ms. Brown a series of eligibility questions. She did not read the application verbatim and inputted Ms. Brown's verbal responses into her computer. After the interview, Ms. Joyner printed the three-page application for signature. Without reading the application, Ms. Brown signed the third page of the application, attesting to the veracity of her responses.

The crucial portion of the application was a section that appeared in the upper half of the first page, entitled *"DRIVER INFORMATION."* This section reads:

> NOTE: All household members age 15 or older, including spouse, domestic partner, roommate(s), as well

4

as those drivers outside the household to whom the insured auto(s) is furnished or available for his or her use, including military and children away at college, must be identified below.[1]

Both the insured and the agent agree that, as to this section of the application, Ms. Brown was not asked if she had a roommate. Ms. Brown testified that she recalls being asked only about other "household members," which she interpreted to refer to those members of her "household" whom she considered her dependents. To her, this meant her two adolescent sons and not Mr. Hampton. However, at the time of the application, neither son was living in her home—they had left the residence as late as July 2015. Nevertheless, one of her sons is listed on the final page of the application as an excluded driver, because "he [is] no longer in [the] household."[2]

As a Titan agent, Ms. Joyner stated that she did not read the entire section to Ms. Brown because she asks the applicant to review the information provided at the conclusion of the interview. Also, Ms. Joyner stated in her deposition that she did not interpret the *driver's* section of the application to mean that the applicant is required to list unlicensed drivers, such as Mr. Hampton. As such, the record clearly establishes that had Ms. Brown disclosed Mr. Hampton on this portion of

---

[1] Titan's Motion for Summary Judgment at Ex. F.

[2] Ms. Joyner explained that Ms. Brown's one son's information was in her file from an earlier application. This apparently prompted Ms. Joyner to ask her about his status for purposes of the policy.

the application, the agent would *not* have included him as a driver because he had suffered a loss of license.

### *Procedural Background*

As a result of the January 24, 2016 accident, Mr. Hampton submitted medical bills to Titan for reimbursement under the policy's $15,000 PIP limits. Titan responded that it was investigating the circumstances of the accident on the basis of Ms. Brown's omission regarding Mr. Hampton's occupancy of the shared residence. Before this investigation was completed, Mr. Hampton filed the present suit seeking a determination that Titan is obligated to pay his PIP bills.

The Complaint was filed on March 21, 2016 and amended on May 19, 2016. Titan then filed a Third Party Complaint against Ms. Brown on May 24, 2016. Discovery in the original action is stayed pending the resolution of the Third Party Complaint. At the close of discovery in the latter case, the parties stipulated to present the pending cross-motions for summary judgment.

Both parties' motions were filed on March 31, 2017. Responses were filed on May 8. Reply briefs were submitted on May 25. The parties presented their oral arguments on the motions at a hearing on June 5. The motions are now ripe for decision.

## STANDARD OF REVIEW

On cross-motions for summary judgment under Delaware Superior Court Civil Rule 56, the court must determine whether any genuine issues of material fact exist.[3] Summary judgment will not be granted if there is a material fact in dispute or if "it seems desirable to inquire thoroughly into [the facts] in order to clarify the application of the law to the circumstances."[4] "All facts and reasonable inferences must be considered in a light most favorable to the non-moving party."[5] Moreover, cross-motions for summary judgment "are not *per se*" concessions that no material factual disputes exist.[6] "Rather, a party [cross-]moving for summary judgment concedes the absence of a factual issue and the truth of the nonmoving party's allegations only for the purposes of its motion, and does not waive its right to assert that there are disputed facts that preclude summary judgment in favor of the other party."[7]

---

[3] *See* DEL. SUPER. CT. CIV. R. 56(c); *Capano v. Lockwood*, 2013 WL 2724634, at *2 (Del. Super. May 31, 2013) (citing Rule 56(c)); *Wilmington Trust Co. v. Aetna*, 690 A.2d 914, 916 (Del. 1996).

[4] *Ebersole v. Lowengrub*, 180 A.2d 467, 469-70 (Del. 1962).

[5] *Nutt v. A.C. & S. Co., Inc.*, 517 A.2d 690, 692 (Del. Super. 1986) (citing *Mechell v. Palmer*, 343 A.2d 620, 621 (Del. 1975); *Allstate Auto Leasing Co. v. Caldwell*, 394 A.2d 748, 752 (Del. Super. 1978)).

[6] *United Vanguard Fund, Inc. v. TakeCare, Inc.*, 693 A.2d 1076, 1079 (Del. 1997). *See also Wilmington Trust Co. v. Aetna*, 690 A.2d at 916; *Capano*, 2013 WL 2724634, at *2; *Total Care Physicians, P.A. v. O'Hara*, 798 A.2d 1043, 1050 (Del. Super. 2001).

[7] *United Vanguard Fund, Inc.*, 693 A.2d at 1079.

## DISCUSSION

"Under Delaware law, the interpretation of contractual language, including that of insurance policies, is a question of law."[8] This interpretation should look to the whole contract without reliance "on any single passage in isolation."[9] The interpretation should not render any provisions "illusory or meaningless."[10] Where an ambiguity in an insurance contract exists, "the doctrine of *contra proferentem* requires the language" be interpreted against the insurer and in favor of coverage.[11]

An ambiguity in an insurance contract exists when the term or provision at issue is "reasonably or fairly susceptible to different interpretations or may have two or more different meanings."[12] In the absence of an ambiguity, however, the parties are bound to the plain meaning of the term; that is, the term's "ordinary and usual meaning."[13] An ambiguity does not exist when the court "can determine the

---

[8] *O'Brien v. Progressive N. Ins. Co.*, 785 A.2d 281, 286 (Del. 2001) (citations omitted).

[9] *Id.* at 287 (citation omitted).

[10] *Id.* (quoting *Sonitrol Holding Co. v. Marceau Investissements*, 607 A.2d 1177, 1183 (Del. 1992); *Seabreak Homeowners Ass'n v. Gresser*, 517 A.2d 263, 269 (Del. Ch. 1986)).

[11] *Id.* at 288 (citing *Rhone-Poulenc Basic Chem. Co. v. American Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992); *Steigler v. Insurance Co. of N. Am.*, 384 A.2d 398, 400 (Del. 1978)).

[12] *Id.* (citing *Rhone-Poulenc*, 616 A.2d at 1196).

[13] *Id.* (citations omitted).

meaning of a contract 'without any other guide than a knowledge of the simple facts on which, from the nature of language in general, its meaning depends.'"[14]

### *Misrepresentation*

Under Delaware law, an insurer of a motor vehicle registered in Delaware must provide minimum insurance coverage for PIP claims.[15] Subject to certain notice provisions, however, those same insurers may exclude certain designated individuals from coverage under the policy.[16] These exclusions are subject to public policy limitations because Delaware's Financial Responsibility Law "mandates a system of insurance intended to protect and compensate persons injured in automobile accidents."[17]

An applicant seeking insurance for her Delaware-registered automobile is required to provide accurate information to the insurer.[18] Titan argues that Ms. Brown's failure to disclose Mr. Hampton as a household member was so inaccurate that it rises to the level of a material misrepresentation. Under 18 *Del. C.* § 2711, if the applicant made a misrepresentation in the application, the three

---

[14] *Id.* (quoting *Rhone-Poulenc*, 616 A.2d at 1196).

[15] *See* 21 *Del. C.* § 2118 (2013 & Supp. 2016); *Progressive N. Ins. Co. v. Mohr*, 47 A.3d 492, 493 (Del. 2012).

[16] *See* 18 *Del. C.* § 3909 (2015 & Supp. 2016).

[17] *State Farm Mut. Auto. Ins. Co. v. Wagamon*, 541 A.2d 557, 560 (Del. 1988).

[18] *See* 18 *Del. C.* § 2711 (2013 & Supp. 2016); *Dickson-Witmer v. Union Bankers Ins. Co.*, 1994 WL 164554, at *2-4 (Del. Super. Apr. 27, 1994).

9

prongs of § 2711 are assessed to determine the materiality of the misrepresentation.[19] A threshold question is, thus, whether the applicant made a misrepresentation in the first place.[20]

A misrepresentation is defined as "an assertion that is contrary to the facts."[21] It is material "if it would be likely to induce a reasonable [insurer] to manifest [its] assent" to insure the individual.[22] "To find a misrepresentation under the statute, it is enough that the plaintiff knew [her] statements were false or had reason to believe them to be incorrect."[23] Therefore, here, the Court must determine whether the section *"DRIVER INFORMATION"* in the application is susceptible to only one interpretation.[24]

### A.    Titan's Interpretation

Titan argues that the term "household members" is plainly defined in the application to include "roommate(s)." Titan is correct. While "household" has

---

[19] *Dickson-Witmer*, 1994 WL 164552, at *3. *See* § 2711. The three prongs of § 2711 assess whether the misrepresentation: (1) was made fraudulently; (2) was "material either to the acceptance of the risk or to the hazard assumed by the insurer;" or (3) if the insurer knew the true nature of the facts, whether this knowledge would have caused the insurer "in good faith" not to have issued the policy, change the premium rate, or impact the scope of the policy. *Id.*

[20] *See Dickson-Witmer*, 1994 WL 164552, at *3.

[21] *Windsor-Mount Joy Mut. Ins. Co. v. Jones*, 2009 WL 3069695, at *3 (Del. Super. July 17, 2009) (citing *Smith v. Keystone Ins. Co.*, 2005 WL 791387, at *2 (Del. Super. Mar. 22, 2005)).

[22] *Id.* (quoting *Smith*, 2005 WL 791387, at *2).

[23] *Oglesby v. Penn Mut. Life Ins. Co.*, 877 F.Supp. 872, 891 (D. Del. 1994) (citations omitted).

[24] *Windsor-Mount Joy*, 2009 WL 3069695, at *3.

10

been defined in related contexts to require a familial relationship,[25] where a contract sets forth a particular definition of a term, that meaning controls.[26]

Further, Ms. Brown admitted that she considers Mr. Hampton a "roommate." The following passage from her deposition is unequivocal on this point:

> A.  [Ms. Joyner] just said who's in the household, and the only name she brought up was my oldest son living there, and I said no, but she didn't ask me was [sic] anybody else in my household.
>
> Q.  That's what the question is, note all household members.
>
> A.  Well, I felt as though he wasn't in my household. I don't take care of him. I take care of myself and my [sons]. . . . [Mr. Hampton] pays his own, I pay my own, I didn't feel though he's in my household. . . .
>
> \*\*\*
>
> Q.  But it also says roommate. You didn't consider him to be a roommate?
>
> A.  She didn't say roommate.

---

[25] *See Engerbretsen v. Engerbretsen*, 675 A.2d 13, 19-20 (Del. Super. 1995), *aff'd*, *Engebretsen* [sic] *v. United Serv. Auto. Ass'n*, 676 A.2d 902, 1996 WL 69827 (Del. 1996) (TABLE). The Superior Court in *Engerbretsen* held that "resident of the household" in a homeowner's insurance policy meant "one who dwells or has an abode under the same roof as the named insured for a duration of sufficient length so that the occupiers can be said to compose a family." *Id.* at 19 (quoting *Amco Ins. Co. v. Norton*, 500 N.W.2d 542, 546 (Neb. 1993)). This definition has been cited favorably in the intervening years. *See, e.g.*, *Allstate Ins. Co. v. Laurenzi*, 2003 WL 22853529, at *2 & n.18 (Del. Super. Nov. 28, 2003).

[26] *See Lorillard Tobacco Co. v. American Legacy Found.*, 903 A.2d 728, 738-39 (Del. 2006).

11

Q. That's what the form says.

A. I didn't—only thing she told me to do was sign where it needed to be signed.

Q. Didn't she ask you the questions?

A. She asked me this one right here (indicating).

Q. This one right here, I'm not sure what that means.

A. The driver's information where she just says household members.

Q. Are you saying that she never said that this section wants you to note all household members age 15 or older including spouse, domestic partner, roommates? She didn't ask you that?

A. No. She didn't read all of that. No.

***

Q. [. . .] You're saying today you can remember back [on] December 23, 2015, that she didn't ask you whether or not there was a roommate?

A. I don't recall her asking me a roommate. If she would have asked me something about roommate, yeah, I would have put his name on here.

***

Q. Let me ask you this: If she did ask you whether you had a roommate, did you consider Mr. Hampton to be your roommate?

[Objections and question re-read]

12

A. Yes. He's my roommate.

Q. Are you saying you didn't read this section, driver information?

A. No, I didn't.[27]

Therefore, Titan's interpretation of "roommate" in the policy is reasonable. Were it the only reasonable interpretation, the Court would be bound to find a misrepresentation occurred, requiring the Court to engage in an analysis of the parties' arguments under the three prongs of § 2711. However, this is not the only reasonable interpretation of this section.

**B.    Ms. Brown's Interpretation**

Ms. Brown interpreted "household members" as persons she considered her dependents: her sons. Ironically, Ms. Brown's interpretation comports more closely with the common law definition of "household members" than Titan's broader definition in the application.[28]

More importantly, there is a notable dissonance between the caption of this section—"*DRIVER INFORMATION*"—and the "note" adjacent this caption. First, from a textual perspective, the caption asks the applicant to list "drivers." Ms. Brown did not consider Mr. Hampton a driver. Surprisingly, nor did the agent. As to this section, Ms. Joyner did not ask Mr. Brown if she had a roommate. Further,

---

[27] Transcript of Deposition of Cheryl Brown at 22:24-28:15 (Sept. 1, 2016).

[28] *See supra*, note 25.

Ms. Joyner concedes she would not have asked about unlicensed individuals in the household because they are not "drivers" within the meaning of the section. Although Titan disavows this comment, arguing the application is clear on its face that it includes "roommates," whether licensed or unlicensed, it is their agent that established this record.

Next, the second clause, which modifies the first clause of the "note," requires the applicant list all "household members . . . as well as **those drivers** outside the household to whom the Insured auto(s) is furnished or available for his or her use, including military and children away at college. . . ." Ms. Brown stated that one of her two sons did not drive. Accordingly, one was excluded under the policy.

On this record, this Court finds that the application section at issue is susceptible to two different interpretations, and Ms. Brown did not make a misrepresentation regarding Mr. Hampton's living status in their shared residence. Moreover, Ms. Joyner never asked her about "roommates" in her residence. To Ms. Brown, it was reasonable to consider Ms. Joyner's failure to ask about roommates as indicative that Mr. Hampton, whom she considered a co-tenant and nothing more, was not material to this section of the application. In other words, Ms. Brown's answer to the *"DRIVER INFORMATION"* section was reasonable.

14

Both she and the agent interpreted the term consistent with Delaware precedent interpreting the same term.

## CONCLUSION

The Court finds that the insurance contract language at issue in this case is fairly susceptible to two different interpretations. Hence, an ambiguity exists in this section of the contract. Where such an ambiguity in an insurance contract exists, the doctrine of *contra proferentem* requires the Court interpret the contract in favor of coverage. The Court finds that Ms. Brown did not misrepresent Mr. Hampton's status as a co-tenant of her mobile home and hereby **GRANTS** Plaintiff/Third-Party Defendant's Motion for Summary Judgment, and **DENIES** Defendant/Third-Party Plaintiff's Motion for Summary Judgment.

**IT IS SO ORDERED.**

Judge Vivian L. Medinilla

oc:   Prothonotary
cc:   All Counsel of Record (via e-filing)

15