# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

MARYDALE PRESERVATION )
ASSOCIATES, LLC AND CATHOLIC )
MINISTRY TO THE ELDERLY, INC., )
                     )
             Plaintiffs, )
         v. ) C.A. No. N19C-05-348 AML CCLD
                     )
LEON N. WEINER & ASSOCIATES, )
INC.; LNW&A CONSTRUCTION )
CORP.; LNWA DEVELOPERS LLC; )
KITCHEN AND ASSOCIATES )
SERVICES, INC., AND ALLIED )
WORLD INSURANCE COMPANY, )
                     )
            Defendants, )
                     )
And )
                     )
LNW&A CONSTRUCTION CORP., INC., )
                     )
          Third-Party Plaintiff, )
                     )
         v. )
                     )
J.F. SOBIESKI MECHANICAL )
CONTRACTORS, INC., )
                     )
         Third-Party Defendant. )

Submitted: August 4, 2022
Decided: September 23, 2022

## MEMORANDUM OPINION

Upon Defendant Allied World Insurance Company's Motion for Summary Judgment: **GRANTED**.

Upon Defendants Weiner & Associates, Inc., LNWA Developers, LLC. and LNW&A Construction Corp.'s Motion for Summary Judgment: **GRANTED** in part and **DENIED** in part.

Upon Defendant Kitchen and Associates Services, Inc.'s Motion for Summary Judgment: **GRANTED** in part and **DENIED** in part.

Upon Defendants Weiner & Associates, Inc., LNWA Developers, LLC. and LNW&A Construction Corp.'s Cross-Motion for Summary Judgment: **DENIED**.

Upon Third-Party Defendant J.F. Sobieski Mechanical Contractors, Inc.'s Cross-Motion for Summary Judgment: **DENIED**.

Mark L. Reardon, Esquire and Jessica L. Reno, Esquire of ECKERT SEAMANS CHERIN & MELLOTT, LLC, Wilmington, Delaware, *Attorneys for Plaintiffs Marydale Preservation Associates LLC, and Catholic Ministry to the Elderly, LLC.*

William A. Crawford, Esquire and Eric Scott Thompson, Esquire of FRANKLIN & PROKOPIK, Newark, Delaware, *Attorneys for Defendants Leon N. Weiner, LNWA Developers, LLC, LNW&A Construction Corp., and Allied World Insurance Company.*

Patrick M. McGrory, Esquire of TIGHE & COTTRELL, P.A., Wilmington, Delaware, *Attorney for Defendant Kitchen Services Associates, Inc.*

Amy M. Taylor, Esquire of HECKLER & FRABIZZIO, Wilmington, Delaware, *Attorney for Defendant J.F. Sobieski Mechanical Contractors, Inc.*

**LeGrow, J.**

This is a construction defect case masquerading as a complex commercial dispute. Plaintiffs, which own and manage a multi-unit residential property, allege the defendants designed and installed faulty HVAC systems that resulted in high relative humidity levels and mold growth in many of the apartments. Defendants are the contractors and architect retained to make improvements to Plaintiffs' apartments, including to the HVAC systems.

Although the focus of Plaintiffs' claims is their contention that Defendants were negligent in their design and installation of the HVAC systems, Plaintiffs' amended complaint contains numerous additional contractual and tort-based claims asserting alternative theories of relief along with an almost completely gratuitous claim for punitive damages. Defendants seek summary judgment as to at least some of those claims. The scattershot nature of the claims and Defendants' motions defies a helpful or comprehensive summary of the issues raised in the motions and addressed by the Court.

The following opinion grants summary judgment with respect to many of Plaintiffs' ancillary claims but denies summary judgment as to the core negligence claims against each defendant. Unless the parties are able to negotiate a reasoned and reasonable resolution to the surviving claims, a jury will have to sort out the factual disputes and causes of action that remain.

1

**FACTUAL AND PROCEDURAL BACKGROUND**

The following facts are drawn from the record submitted by the parties in connection with the pending summary judgment motions. This case arises out of a construction project at Marydale Retirement Village (the "Property"), a housing community[1] for low-income and senior citizens with disabilities.[2] The Property's original interior space consisted of wood-studded walls, carpet and tile flooring, drywall finishes, and electric baseboard heating with cooling provided through wall units.[3] Between July 2016 and October 2017, the Property's owners undertook a major renovation, which the parties refer to as the "Marydale Project." Defendants improved insulation, removed and replaced interior drywall and flooring, and designed and installed new heating, ventilation, and air conditioning systems ("HVAC systems").[4] But by 2018, mold was detected in several of the units, purportedly as a result of Defendants' faulty design and installation of the HVAC systems. In summary, Plaintiffs contend Defendants designed and installed (i)

---

[1] The housing community included one-hundred and eight residential units and one community building at Marydale Retirement Village, located in Newark, Delaware. Compl. ¶ 1.

[2] Compl. ¶ 1.

[3] Def. Kitchen and Associates Services, Inc. Br. in Supp. of its Mot. for Summ. J. (hereinafter "K&A's Br. in Supp.") at 1.

[4] Pls.' Br. in Opp. to Defs.' Kitchen and Associates Services, Inc. and LNWA Entities' Motion for Summ. J. (hereinafter "Pls.' Br. in Opp.") at 3; *Id.,* Ex. A, Vible Depo. at 212-13.

oversized HVAC units, and (ii) leaky ductwork that led to the development of mold in many of the Property's apartment units. This litigation followed.[5]

## A. The Parties to the Litigation

Plaintiff Marydale Preservation Associates, LLC ("Marydale") owns the Property.[6] Plaintiff Catholic Ministry to the Elderly, Inc. ("CME") is a nonprofit corporation under the auspices of the Catholic Diocese of Wilmington and is Marydale's managing member and property manager (collectively, Marydale and CME are referred to as "Plaintiffs").[7] All Defendants in this case entered into contracts with Marydale or its general contractor to perform various roles in connection with the Marydale Project.

Defendant Leon N. Weiner and Associates, Inc. ("Weiner") and Defendants LNWA Developers, LLC, and LNW&A Construction Corp.[8] (collectively, "LNWA") perform development and construction services throughout the mid-Atlantic region, including Delaware, and were hired because of their expertise in developing residential housing for low-income individuals.[9] Defendant Kitchen and

---

[5] Specifically, Plaintiffs allege high levels of humidity in the residential units has led to the growth of mold, and the newly installed HVAC units have defects that permit infiltration of outside air through the ductwork. Mot. of Leon N. Weiner & Associates, Inc., LNW&A Construction Corp., and LNWA Developers, LLC for Summ. J. on Pls.' Claims for Negligence, Fraudulent and/or Negligent Misrepresentation and Concealment, Civil Conspira[cy], Prohibited Trade Practices, and Punitive Damages (hereinafter "Weiner and LNWA's Mot. for Summ. J.") at 4, Ex. 3.
[6] Pls.' Br. in Opp. at 4.
[7] *Id.*
[8] LNW&A Developers, LLC provided development and design services. LNWA Construction Corp. is Weiner's construction division. Compl. ¶ 32.
[9] Pls.' Br. in Opp. at 5.

Associates Services Inc. ("K&A") is an architectural and engineering firm based in New Jersey that Weiner retained in 2014 to design the Marydale Project, including the HVAC systems at issue in this case.[10] LNW&A Construction Corp. hired Third-Party Defendant J.F. Sobieski Mechanical Contractors, Inc. ("Sobieski") as a subcontractor to install the HVAC systems.[11]

## B. Contracts at Issue

Five specific contracts involving the Property and the Marydale Project are important to this case. CME first contracted with Weiner for assistance with the Marydale Project's development on March 12, 2014 (the "CME Development Agreement").[12] Under the CME Development Agreement, CME formed an entity, Marydale, to which it transferred ownership of the Property.[13] Marydale, as its own entity, then entered into a development agreement with Weiner on July 14, 2016 (the "Marydale Development Agreement").[14] On the same day, Marydale contracted with LNWA and K&A for the development, design, and construction of the Marydale Project (LNWA's "Construction Contract" and K&A's "Architect

---

[10] *Id*. at 6. On September 4, 2013 (rev. Feb. 17, 2014), K&A submitted a "Letter of Understanding for Professional A/E Services" to Weiner. Weiner and LNWA's Mot. for Summ. J., Ex. 2. The Letter of Understanding incorporated minutes of two meetings held in January 2014 with K&A, LNWA, and representatives of CME all present. K&A's Br. in Supp. at 2. Under the Letter of Understanding, K&A agreed to provide architectural and engineering design services for the Marydale Project, and the Letter of Understanding stated the parties ultimately would enter a more formal contract. *Id*.

[11] Pls.' Br. in Opp. at 6.

[12] *Id*. at 5. *See id.* Ex. E, Development Agreement.

[13] Compl. ¶ 23.

[14] Pls.' Br. in Opp., Ex. E, Development Agreement with Amendments.

4

Contract").[15]  Sobieski entered into a contract (the "Subcontract") with LNW&A Construction Corp. on July 19, 2016.[16]  The Construction Contract, Architect Contract, and Subcontract each are separate "AIA Documents."[17]  AIA Documents, including the agreements at issue here, purportedly are "standard" in the construction industry.[18]

### 1.  The CME Development Agreement

In the CME Development Agreement, Weiner represented it had extensive experience in the design, construction, development, and financing of affordable housing.[19]  The CME Development Agreement included representations and warranties that Weiner, for example, would (i) enter and enforce contracts with qualified professionals; (ii) oversee and manage the Project's plans; (iii) construct the Project per plans and specifications; and (iv) inspect the progress and inform CME regularly regarding the Project's status.[20] Additionally, under the CME Development Agreement's terms, LNWA had complete authority to negotiate, enter

---

[15] Pls.' Br. in Opp. at 5; Ex. F, Ex. G. LNWA Developers, Marydale, and K&A were parties to the Architect Contract. Pls.' Br. in Opp. at 6; Ex. G.

[16] Pls.' Br. in Opp. at 6. *See* AIA Subcontract, Ex. I.

[17] AIA stands for The American Institute of Architects.

[18] *See, e.g.,* AIA DELAWARE, aiadelaware.org/about-aia-delaware.html (last visited Aug. 30, 2022).

[19] Pls.' Br. in Opp. at 7, Ex. E at 5. Plaintiffs allege Weiner received a developer fee of $860,000 in exchange for its expertise; *Id.*, Ex. E at 1, "D".

[20] *Id.*, Ex. E; *see also* K&A's Br. in Supp. at 3, Ex. 3.

into, administer, and enforce contracts with architectural and engineering professionals.[21]

## 2. The Marydale Development Agreement

The CME Development Agreement was amended twice; the 2016 revisions amended the original CME Development Agreement to include the newly created Marydale entity as the Owner of the Project and LNWA Developers, LLC as the Developer.[22] On July 14, 2016, CME transferred the Property to Marydale, with CME remaining as the property manager.[23] That same day, Marydale entered into the Marydale Development Agreement with LNWA Developers, LLC in furtherance of the CME Development Agreement.[24] The roles and responsibilities of Marydale and LNWA Developers, LLC largely remained the same as those CME and LNWA held under the earlier agreements.[25] Citing the Marydale Development Agreement, Plaintiffs allege LNWA Developers, LLC accepted responsibility for administering the construction, improvement, and development of the Marydale Project.[26] Specifically, LNWA Developers, LLC agreed it would (i) assist in planning the construction, improvements, and development of the Marydale Project; (ii) establish and implement appropriate administrative and financial controls for the design and

---

[21] K&A's Br. in Supp. at 3, Ex. 3.
[22] *Id.* at 4, Ex. 4.
[23] Compl. ¶ 26.
[24] *Id.* ¶ 27. *See also*, Pls.' Br. in Opp., Ex. E, "Development Agreement" at 1.
[25] K&A's Br. in Supp. at 4.
[26] Pls.' Br. in Opp., Ex. E "Development Agreement."

6

construction of the Marydale Project; (iii) keep Plaintiffs fully informed on a regular basis of the design's progress and the Marydale Project's construction; (iv) inspect the progress of the construction's course and verify construction was being carried out substantially in accordance with the plans and specifications approved by Plaintiffs; and (v) notify Plaintiffs in the event construction was not meeting that standard.[27] According to K&A, under the agreement, Marydale did not retain any oversight role in the Marydale Project and intentionally deferred all decision-making authority to LNWA.[28]

### 3. The Construction Contract

On July 14, 2016, Marydale also entered into the Construction Contract with LNW&A Construction Corp.[29] Under the Construction Contract, LNW&A Construction Corp. was required to perform construction work in accordance with the contract documents' plans and specifications.[30] LNW&A Construction Corp. agreed to (i) indemnify Marydale from loss or damages caused by LNW&A Construction Corp.'s negligent acts or omissions; (ii) comply with all laws, statutes, ordinances, codes, rules, and regulations concerning the safety of persons or

---

[27] *Id.*, Ex. E, "Development Agreement" at 2-3.
[28] K&A's Br. in Supp. at 5.
[29] Compl. ¶ 32.
[30] Pls.' Br. in Opp., Ex. F.

7

property; (iii) comply with Delaware State Housing Authority's ("DSHA") standards; and (iv) provide insurance coverage.[31]

The Construction Contract also included terms concerning LNWA Developers, LLC. The Construction Contract incorporated the construction specifications by reference, and Plaintiffs allege LNWA Developers, LLC was required to, *inter alia*, (i) review the construction's compliance with contract documents; (ii) install and connect all mechanical systems per the manufacturer's instructions and best trade practices; (iii) be responsible for all mechanical equipment performance and correct deficiencies or replace equipment to achieve the required performance at no cost to Marydale; (iv) ensure the HVAC systems performed satisfactorily and acceptably; (v) provide testing and balancing of all mechanical and HVAC systems with an independent certified balancing contractor under the supervision of a professional engineer; and (vi) provide pressure testing for ductwork, seal all ducts with mastic, and install volume dampers at point on supply, return, and exhaust systems where branches extend from the larger ducts.[32] In addition, LNWA Developers, LLC was to "supervise and direct" the Marydale Project with its best skill and attention.[33] Importantly, LNWA Developers, LLC was "not relieved of obligations to perform the Work in accordance with the Contract

---

[31] *See* Pls.' Br. in Opp., Ex. F.
[32] Compl. ¶ 33.
[33] K&A's Br. in Supp. Ex. 17, Section 3.3.1.

Documents either by activities or duties of the Architect in the Architect's administration of the Contract."[34]

### 4. The Architect Agreement

On July 14, 2016, Marydale also signed the Architect Agreement with K&A for K&A's architectural and engineering services. Weiner was an additional signatory and expressly recognized as developer for the Marydale Project.[35] LNWA also signed the Architect Agreement because it was responsible for administration and oversight of the Marydale Project's design.[36] The Architect Agreement allowed K&A to communicate directly with Weiner.[37] Under its terms, K&A's obligations involved the "usual and customary structural, mechanical, and electrical engineering services."[38] K&A agreed to (i) provide professional services with the skill and care ordinarily provided by architects practicing in the same locality; and (ii) perform its services as expeditiously as is consistent with professional skill and care.[39] Plaintiffs allege K&A was tasked with designing a "functioning HVAC system and specifying approximately sized heating and cooling units for the Marydale Project, among other things."[40] Additionally, K&A was required to provide "construction phase services"

---

[34] *Id.* Ex. 17, Section 3.1.3.
[35] Compl. ¶ 37.
[36] K&A's Br. in Supp. at 8-9.
[37] Compl. ¶ 40.
[38] K&A's Br. in Supp. at 9.
[39] Pls.' Br. in Opp., Ex. G. at 2-5,
[40] Pls.' Br. in Opp. at 9.

which included periodic site visits, and to keep Marydale and LNWA reasonably informed about the Marydale Project's quality and progress.[41]

### 5. The Subcontract

LNW&A Construction Corp. entered into the Subcontract with Sobieski on July 14, 2016.[42] Sobieski was required to prepare and submit drawings showing how it would accomplish the Marydale Project.[43] According to K&A, these "shop drawings" are not contract documents, but in submitting shop drawings, the contractor represents to the owner and architect that he or she (i) has reviewed and approved them; (ii) verified the materials, field measurements, and field construction criteria related thereto; and (iii) checked and coordinated the information within those submittals against the contracts' requirements.[44] According to K&A, even the architect's approval of deviations from the contract documents did not excuse LNWA from responsibility for those deviations.[45]

## C. The Marydale Project's Original Design Drawings

Marydale's original drawings requested the baseboard heat and through-wall AC units be replaced with a "split HVAC system (outside condenser and electric

---

[41] K&A's Br. in Supp. at 10.
[42] *Id*. Ex. 18. On July 19, 2016, Sobieski entered into an AIA Contract with LNWA. Open. Br. in Supp. of Third-Party Def. Sobieski Mot. for Summ. J. on Third-Party Pl. LNW&A (hereinafter "Sobieski Br. in Supp. Mot. for Summ. J.") at 5.
[43] *Id*. at 13.
[44] *Id*. at 14.
[45] *Id*.

heat air handler)."[46]  The HVAC equipment upgrade included a heat pump.[47]  The initial design first was submitted to the various authorities with jurisdiction over it on October 23, 2015.[48]  The final design drawing approval was issued on April 12, 2016.[49]  The expected duration of the Marydale Project was sixteen months.[50]  Seventy-two residential units were finished and occupied by June 2017.[51]

**D. Defendants' Deviation from the Marydale Project's Original Design**

Once construction began, several problems arose, resulting in deviations from and updates to the original, approved drawings. The major deviations included (i) the size of the indoor air-handling unit and (ii) the associated ductwork.

According to K&A, the original, approved design for the HVAC Heat Pump unit was a York LX Series.[52]  Those series include a nominal 3-ton indoor air-handling unit with a cooling capacity of 36,000 BTUs.[53]  Sobieski, however, replaced the York LX Series during the drawing process with "similarly-sized

---

[46] *Id*. at 5, Ex. 1 p. 214-218; Ex. 5.
[47] *Id*. at 5, Ex. 6.
[48] *Id*. at 6. Ex. 10. The Marydale Project did not commence until 2015 due to an unsuccessful application for DSHA tax credits in April 2014. K&A's Br. in Supp. at 6.
[49] *Id*. at 6.
[50] *Id*. at 17.
[51] *Id*.
[52] *Id*. at 12. Specifically, the approved units were a YHJF18S outdoor unit and AHE24B indoor unit. *Id., *Ex. J. According to K&A, these models "equate" to a 2-ton air handling unit and a 1.5-ton heat pump.  *Id*. at 12.  These models were selected by the manufacturer during the design process. *Id*. All parties agree the smallest available heat pump split system is 1.5-tons. *Id*. at 13.
[53] BTU is defined as "British Thermal Unit," a unit of measurement that shows how much energy an air conditioner uses to remove heat from the dwelling within an hour.

Lennox equipment," and that model ultimately was installed.[54] The replacement model was a 2-ton indoor air-handling unit and 1.5-ton outdoor heating pump with a total cooling capacity of 19,200 BTUs.[55]

As for ductwork, Plaintiffs allege the approved design called for a "fully ducted supply" and "return ductwork" in all residential units.[56] An increased potential for leaky ductwork purportedly arises from the use of panned ductwork rather than prefabricated ducts (also called "fully ducted").[57] Prefabricated ducts are formed with sheet metal and require only one joint to be sealed using mastic.[58] Panned ductwork, in contrast, utilizes sheet metal and framing members and may require many more joints to be sealed with mastic.[59] Panned ductwork therefore involves a higher potential for human error during installation and a higher likelihood of leaky joints as a result.[60]

According to Plaintiffs, one reason Sobieski's bid was successful was its capacity to create the requisite ductwork in-house rather than by subcontracting.[61] Sobieski submitted drawings in August 2016, revealing the need to install 14.00" x

---

[54] K&A's Br. in Supp. at 14, Ex. 21.
[55] Pls.' Br. in Opp. at 10.
[56] *Id.*
[57] Pl. Br. in Opp., Ex. N at 73-75.
[58] *Id.*, Ex. N at 74.
[59] *Id.*
[60] *Id.*, Ex. N at 73-75.
[61] *Id.* at 10, Ex. O. According to Plaintiffs, any change to the return ductwork required Marydale's approval. *Id.*

2.25" sized ductwork in certain locations instead of reframing as necessary.[62] K&A approved that design drawing on August 5, 2016.[63]

But on August 26, 2016, the construction team onsite (LNW&A Construction and Sobieski) concluded Sobieski's prefabricated return ductwork (the full ducting) would not fit in the wall between the bedroom and living room of the residential units.[64] After recognizing the issue, a representative of LNWA Developers, LLC, Chad Reynolds ("Reynolds") called K&A architect Tammy Schiavo ("Schiavo") for approval to deviate from the contract specifications. According to LNWA, approval was provided over the phone.[65] That deviation resulted in the use of panned ductwork.[66] No change order was issued to reflect the change from the original, approved design because, according to Weiner and LNWA, the Marydale Project's overall cost and schedule remained unchanged even with the updated design.[67] The Court infers from this argument that had panned ductwork affected the Marydale

---

[62] K&A's Br. in Supp. at 16. According to K&A, Sobieski stated it was because 14.00" x 2.25" "will be the most you can get out of the wall opening." *Id*. Ex. 23.

[63] *Id*. at 16. K&A contends "[n]owhere does it state that Sobieski was intending to not fabricate and install fully rigid sheet metal ducts in any locations." *Id*.

[64] Pls.' Br. in Opp. at 10.

[65] Chad Reynolds and Brad Feldman of LNWA met with Bill Cannon from Sobieski. *Id*. Reynolds testified the parties were in agreement that the return air ductwork would be panned ductwork, utilizing framing members to form a return air plenum, as opposed to the prefabricated, 100% ductwork called for in the contract drawings and specifications prepared by K&A. *Id*. 10-11; Ex. N at 79-86. DSHA was part of these discussions as well. Weiner and LNWA's Mot. for Summ. J at 15. "Unfortunately, much of the discussion regarding the use of panned ducting with representatives of Kitchen was done verbally and not recorded in writing." Weiner and LNWA's Mot. for Summ. J. at 16. (citing Reynolds Dep. 85:17-86:4.)

[66] Pls.' Br. in Opp. at 11; Ex. N. at 83-84.

[67] Weiner and LNWA's Mot. for Summ. J. at 16.

Project's overall cost or schedule, the updated design would have needed an executed change order.

K&A argues Sobieski deviated from original, approved designs beyond the selection of different HVAC units and use of panned ductwork. According to K&A, Sobieski originally submitted to LNW&A Construction Corp. and K&A drawings of a thermostat with control option features to address humidity levels.[68] But, according to K&A, "[f]or some unexplained reason," Sobieski did not install the approved thermostat.[69] Instead, the thermostat installed did not include the option to control for humidity and temperature.[70]

## E. The Progress Meetings & MEP # 1 Report

On September 9, 2016, LNWA, K&A, Marydale, and DSHA held an on-site progress meeting (the "First Progress Meeting").[71] According to LNWA, the problem with return ductwork and Sobieski's solution to that problem was shared with all parties at this time, and Plaintiffs voiced no objection.[72] Plaintiffs dispute this factual assertion.[73] On September 19, 2016, Schiavo of K&A issued a Field

---

[68] K&A's Br. in Supp. at 14-15. Among these is a capability to command the indoor fan to a lower speed, extend the fan runtime to improve air mixing and lower the target setpoint up to two degrees Fahrenheit to allow time for proper dehumidification. Sobieski Br. in Supp. Mot. for Summ. J. at 15, Ex. 22.

[69] K&A's Br. in Supp. at 15.

[70] *Id*.

[71] Pls.' Br. in Opp. at 11.

[72] *Id*. at 12.

[73] According to Plaintiffs, during discovery, Reynolds was unable to identify the Marydale representative who purportedly consented to the alternative arrangement. Pls.' Br. in Opp. at 12; Ex. N at 91-93. Additionally, Reynolds was unable to identify a Marydale representative who was

Meeting Report memorializing the First Progress Meeting.[74]  The Field Meeting

Report did not contain any reference to the ductwork field conflict or to the change

in the return air ductwork from "fully ducted" as specified in the contract documents

to "panned ductwork."  The Field Meeting Report also did not state that the panned

ductwork would require the use of framing members, which specifically were

prohibited in the contract documents.[75]  And the Field Meeting Report indicated duct

sizes were to be left as documented and the construction team "must get owner's

approval for any change."[76]

A scheduled progress field inspection was held on September 22, 2016 (the

"Second Field Meeting"); the report reflecting that inspection was issued on

September 27, 2016 (the "MEP#1 Report"). [77] Angel Placeras ("Placeras") authored

the MEP #1 Report, and it was given to Marydale, LNWA Construction, DSHA, and

the financial institutions involved in the Marydale Project.[78]  In the MEP#1 Report,

---

advised of the field conflict, alternative resolution, or potential cost and/or quality implications concerning the ductwork. *Id*. Ex N at 175-178. As expected, Marydale denies ever being advised of the ductwork field conflict in a meaningful way and denies consenting to the ultimate decision to use panned return ductwork on the Marydale Project. *Id*. at 12; Ex. A.

[74] *Id*. at 13.

[75] *Id*. at 13. Ex. O.

[76] *Id*., Ex. O at 11.

[77] K&A's Br. in Supp. at 16, Ex. 25

[78] Pls.' Br. in Opp. at 13, Ex. P; Doc. 5, at 17, Ex. 25 Item No.1. In the MEP#1 Report, Placeras first identified the framing members in the return air ductwork. Pls.' Br. in Opp. at 13, Ex. P, n. 1. K&A's lead engineer testified the MEP#1 Report indicated work was not done in conformance with contract documents and was a "course correct" notice moving forward and an order to remediate the prior work. *Id*. *See* Ex. Q. Plaintiffs allege nothing in writing indicated "approval" change from 100% fully ducted return ductwork to panned ductwork utilizing framing members. *Id*. at 14. The MEP #1 Report stated "that wall framing members will be used as part of the return

15

Placeras first identified the framing members in the return air ductwork.[79]   LNWA continued to move forward with the Marydale Project after the MEP #1 Report was issued.

### F. Failure to Test and Balance the HVAC Units

On September 23, 2016, LNW&A Construction Corp. asked K&A whether testing and balancing of the HVAC units was required during construction of the first set of apartments.[80]  Placeres responded that the HVAC systems were required to be balanced.[81]  According to Plaintiffs, however, Reynolds informed colleagues that testing and balancing forms for the units should not be completed because the procedure would cost $300-$400 per apartment, increasing overall construction costs by $30,000 or $40,000.[82]  Testing and balancing of the HVAC systems in the apartment units ultimately was not completed.

### G. The Marydale Project's Completion and the Mold Complaints

In the summer of 2018, after construction for the Marydale Project was complete, some residents at the Property began complaining about high levels of

---

system. K&A recommends that the return air system be 100% ducted, meaning sheet metal branch ductwork should be extended from the return air trunk to all return grilles." K&A's Br. in Supp. at 17, Ex. 25 Item No.1.

[79] Pls.' Br. in Opp. at 13, Ex. P, n. 1

[80] *Id*. at 14, Ex. R.

[81] *Id*.

[82] *Id*. at 15, Ex. S.  According to Reynolds, informal testing and balancing was performed by the HVAC subcontractor. *Id*., Ex. N at 44-50.  But the HVAC's subcontractor's project manager testified his team did not do any type of testing and balancing. *Id.,* Ex. T at 77.

humidity in their residential apartments.[83]  Marydale contends once mold growth was identified, it immediately alerted both LNWA and K&A.[84]  Marydale then contracted with 1 Source, an environmental hygiene company, to identify the type of mold at issue and the remediation efforts necessary to ensure a safe living environment for residents.[85]  Since September 2018, Marydale has held monthly mold inspections and remediated mold growth based on 1 Source's recommendations.[86]  Several residents have experienced mold growth since September 2018 in their apartments, some up to six times.[87]  According to Plaintiffs, after the first affected unit was identified in September 2018, mold growth was found in thirty-eight of the apartment units by November 2018.[88]

## H. Brightfields' Onsite Consultation and Report with Findings

Before this lawsuit was filed, the parties to the litigation initially cooperated to identify and resolve potential causes of mold growth.[89]  The parties conferenced weekly to discuss issues and possible solutions.[90]  In 2018, Marydale contracted with

---

[83] Pls.' Br. in Opp. at 3; Ex. A, Vible Depo at 164, 260-62.

[84] *Id*. at 18.

[85] *Id*. at 16

[86] *Id*. at 16, Ex. B. 1 Source reviews and re-inspects to confirm that mold growth has been appropriately remediated after INX Indoor Air Quality, the company hired to remediate the mold, remediates them. *Id*.

[87] *Id*. at 22.

[88] *Id*. at 3. Plaintiffs contend by April 2021, seventy-three out of the one-hundred and eight apartments experienced some level of mold growth and needed mold remediation; thirty-two units experienced recurring mold and needed multiple rounds of remediation. *Id., Ex. B.

[89] *Id*. at 18.

[90] *Id*. at 19.  During the collaboration, at least two engineering firms, one environmentalist, one industrial hygienist, one testing and balancing agency and two mold remediation companies were

Brightfields, an environmental consulting firm, to determine the cause of the elevated humidity levels and mold.[91] K&A alleges that when a resident first complained of water leaks and high humidity in her apartment, Unit 177, Sobieski responded and determined the HVAC unit was overcharged and corrected the problem.[92] A second complaint from Unit 79 was recorded on August 23, 2018.[93] On September 14, 2018, Brightfields inspected Units 177 and 79.[94] One week later, Brightfields issued a report (the "Brightfields Report") with its findings concerning those units.[95]

The Brightfields Report indicated the recorded humidity level in the units ranged from 64.1%-66.4%.[96] Specifically, after investigating Unit 177, Brightfields found the relative humidity around 60% while also determining that the "HVAC unit may be sized too large for the space, causing 'short cycling.'"[97] Short cycling occurs

retained to identify the mold and potential causes at Marydale. *Id.* At the time, according to Plaintiffs, all parties agreed to the selected testing entities to help identify the root cause of high relative humidity. *Id.*

[91] *Id.* at 18, Ex. W.

[92] K&A's Br. in Supp. at 17. Marydale apparently reported there was a "noticeable difference in the humidity in the unit after operating in just a few minutes." *Id.*, Ex. 26 at LNWA 4073.

[93] *Id.* at 17. LNWA suggested Marydale engage in an environmental consultant following the complaint. *Id.* at 18. Marydale hired Brightfields, Inc. on September 11, 2018. *Id.*, Ex. 28.

[94] *Id.* at 18.

[95] *Id.* at 18., Ex. 29

[96] K&A's Br. in Supp. at 19. ASHRAE Standard 55-1992 recommends relative humidity (RH) levels in the indoor environments to be between 30% and 60%. Pls.' Br. in Opp., Ex. W at 7. "High relative humidity within the unit may be caused by moisture intrusion into the slab and/or the unit's HVAC system inefficiently removing moisture from the indoor air. No other moisture intrusion was identified within the unit." *Id.* at 11.

[97] K&A's Br. in Supp. at 18, Ex. 28.

when a furnace or air conditioner reaches the designated temperature too quickly and therefore turns off before the system can remove humidity from the air. Brightfields noted the occupant set the temperature to below the recommended level but identified the presence of mold on personal effects.[98] With respect to Unit 79, the Brightfields Report identified the presence of mold on personal effects and recorded humidity ranging from 77.4%-81.0%.[99] With this Unit, according to K&A, the resident was not using the air conditioner, an issue that would result in problems "regardless of renovations."[100] Marydale staff told the occupant she needed to run her air conditioning, explaining the benefit of doing so.[101]

Overall, concerning the humidity, the Brightfields Report indicated active moisture intrusion may be present through the slab or the HVAC system may not be removing moisture efficiently.[102] Specifically, the Brightfields Report found "improper refrigerant charging" and "short cycling: due to an improperly sized

---

[98] *Id*. at 18-19. Brightfields also spot-measured the relative humidity but no data has been provided for the tests. *Id*.

[99] *Id*. at 18. K&A contests the conclusion drawn from this test. K&A contends (i) the AC unit was not running in Unit 79; (ii) Brightfields spot-measured the relative humidity in the Unit at an undiscovered number of times in undisclosed locations, and (iii) no data has been provided of Brightfields' tests. *Id*. The measured moisture content of the walls and carpet were rated "dry", and tile registered as "risk." *Id*. None registered as "wet." *Id*. These factual issues cannot be resolved on the pending motions.

[100] K&A's Br. in Supp. at 18, Ex. 28 at 3.

[101] *Id*. at 17.

[102] *Id*. at 19.

HVAC unit, and/or improper HVAC balancing" as possible reasons for elevated relative humidity.[103]

## I. Brightfields Returns and K&A Installs Data Loggers

Brightfields returned to the Property on October 17, 2018 to inspect two more units: 130 and 156.[104] In Unit 130, the thermostat was set to "cool" at 76 degrees while the outdoor temperature was at 61.1 degrees; the HVAC system therefore was not running.[105] Brightfields registered the relative humidity in Unit 130 between 62.8% and 64.6%.[106] For Unit 156, Brightfields noted the system was set to "off" and not in operation.[107] Even so, the relative humidity readings were in the acceptable range at 52.5%-54.4%.[108] The remaining residential units were inspected in November 2018, and mold was identified in 38 of the 108 units.[109] Marydale then hired a mold remediation consultant.

---

[103] *Id*. K&A contends in reaching the conclusions, Brightfields never measured the HVAC unit run times. *Id*.; Pls.' Br. in Opp. Ex. W at 12.
[104] K&A's Br. in Supp. at 19, Ex. 30.
[105] *Id*. at 19.
[106] *Id*. K&A indicates this is "surprising" because the AC unit was not used by the occupant. *Id*.
[107] *Id*.
[108] *Id*. at 20. K&A takes issue with the fact Brightfields' conclusions and recommendations are the same for each unit though the conditions observed were different for each unit. *Id*. Brightfields responds by saying (i) there may have been high relative humidity and that such condition may be because moisture is wicking through the slab or that the moisture in the air is condensing on the colder tile; or (ii) the HVAC systems may not be adequately removing moisture even in units where it established occupants are not operating the systems. *Id*. According to K&A, following Brightfields' involvement, Marydale changed the HVAC filters but declined K&A's request to review the thermostats which had been placed to gather certain data. *Id*., Ex. 31, 32. K&A alleges the change of filters was the first time in years. *Id*.
[109] *Id*. at 20, Ex. 33.

In the fall of 2018, the parties decided K&A would install data loggers in four units.[110] K&A collected over 34,000 measurements from October 29, 2018 to November 17, 2018.[111] The data, according to K&A, establishes that while operating, the HVAC systems adequately and properly maintained relative humidity levels at around 50%-55%.[112] But at this time of the year, the systems were operating in heating mode, not cooling. The parties therefore agreed K&A would install more data loggers in March 2019 to run through the 2019 cooling season.[113]

But, according to K&A, Marydale grew impatient with the process and sent a letter in April 2019 to all residents claiming the instances of mold growth were the direct result of design and installation errors in the HVAC systems.[114] In July 2019, at the recommendation of David Hoffman ("Hoffman"), a licensed engineer with Gipe Associates, Inc., Marydale retained mechanical system contractor Modern Controls to install a "temporary fix" to help dehumidify the apartments as the air-handling units ran.[115] A few months later, Marydale replaced every thermostat in

---

[110] *Id*. at 21.
[111] *Id*. at 20. Ex. 35.
[112] *Id*. at 21.
[113] *Id*.
[114] *Id*. at 22, Ex. 36.
[115] Pls.' Br. in Opp. at 16. The temporary fix is a thermostat pre-set that makes the heat pump run simultaneously with the air-handling unit while the apartment is in cooling mode. *Id*., Ex. U. This process ensures the systems are not short-cycling and run for a long enough time to bring the temperature in the apartments down and dehumidify as it cools. *Id*. Installation of the temporary thermostats cost Marydale $43,295.00. *Id*. Plaintiffs emphasize the temporary nature of this fix; the current solution is energy inefficient and highly costly to the low-income residents at Marydale and does not address moisture infiltration associated with the leaky ductwork. Pls.' Br. in Opp. at 17, Ex. C at 15-15; Ex. D at 514-15, 520, 529-531.

every unit and modified the HVAC equipment to add a reheat sequence to actively control humidity levels.[116]

Plaintiffs continued to have an industrial hygienist perform monthly mold inspections, but Defendants contend the data was not shared with the other parties.[117] Mold was visibly observed on twenty-four more occasions during monthly inspections between September and December 2019.[118] The units were inspected again from June through November 2020, and the relative humidity was recorded.[119] At this time, the observed relative humidity for each of the units was between 37%-46% during the cooling season; Hoffman testified the modified equipment was adequately controlling humidity.[120] But despite the indoor relative humidity being in check, K&A alleges there were still twenty-five additional observed mold conditions in units during 2020; of these, eight were observed in units that had not previously experienced mold.[121]

Marydale filed suit in May 2019, claiming (i) the HVAC equipment was oversized for cooling loads and therefore short cycling; and (ii) defendants failed to

---

[116] K&A's Br. in Supp. at 22. Marydale installed the thermostats from July 24, 2019, to August 23, 2019. *Id*., Ex. 37. The modification of the installed equipment was designed and directed by David Hoffman. *Id*., Ex. 38.

[117] K&A's Br. in Supp. at 23.

[118] *Id*. K&A points out fourteen of the instances were found in November, during the heating season. *Id*.

[119] *Id*., Ex. 40.

[120] K&A's Br. in Supp. at 23.

[121] *Id*.

inform Plaintiffs of their decision to "pan" supply and return duct work, instead of utilizing solid ductwork as required by the plans and specifications.[122]

## J. Filings in this Court

Plaintiffs filed this case on March 31, 2019 against Weiner, LNW&A Construction Corp., LNWA Developers LLC, and K&A.[123] Plaintiffs asserted negligence claims against all Defendants; breach of the CME Development Agreement against Weiner; breach of the Marydale Development Agreement against LNWA Developers, LLC; breach of the Construction Contract against LNW&A Construction Corp.; breach of the Architect Agreement against K&A; breach of implied warranties of habitability and workmanship against LNW&A Construction Corp.; fraudulent and/or negligent misrepresentation and concealment against all Defendants; civil conspiracy against all Defendants; prohibited trade practices against all Defendants; and a claim for punitive damages against all Defendants.[124] Plaintiffs filed an Amended Complaint on August 20, 2019 to include a claim against Defendant Allied World Insurance Company ("Allied") for breach of the performance bond that Allied issued to LNW&A Construction Corp. in connection with the Marydale Project.[125]

---

[122] Compl. ¶¶55(d), 100; K&A's Br. in Supp. at 22. Marydale also demanded the data loggers be removed. *Id*.

[123] D.I. 1.

[124] D.I. 1.

[125] D.I. 7. Plaintiffs allege, despite repeated requests, "Allied has been unable or unwilling to honor its obligations under the Performance Bond. Specifically, Allied has failed to correct the defective

Weiner, LNW&A Construction Corp., and LNWA Developers, LLC filed their joint answer with affirmative defenses to the Amended Complaint on October 10, 2019, which included a third-party complaint against Sobieski.[126] K&A filed an answer with affirmative defenses, a cross-claim and counterclaim on October 11, 2019, alleging a cross-claim for contribution and indemnification against "each co-Defendant for any amount which [K&A] may be require[d] to pay to Plaintiffs."[127] K&A's counterclaim alleged breach of contract for unpaid "additional services" against Marydale.[128] Sobieski filed its answer on January 6, 2020, alleging affirmative defenses and a cross-claim for contribution and indemnification.[129]

Allied filed a Motion for Summary Judgment ("Allied's Motion") on May 6, 2022, which is unopposed.[130] Weiner and LNWA filed a joint Motion for Summary Judgment ("Weiner and LNWA's Motion") that same day against Plaintiffs and a Cross-Motion for Summary Judgment ("Weiner and LNWA's Sobieski Motion") against Sobieski.[131] Sobieski filed its Cross-Motion for Summary Judgment

---

construction work performed by LNWA Construction or to complete the work that LNWA Construction failed to perform under the Construction Contract. *Id*. ¶ 146. Plaintiffs allege "Allied's inactions are a default under the terms of the Performance Bond" and "[d]espite timely notice from Marydale, Allied has failed or refused to remedy its default under the Performance Bond." *Id*. ¶ 148.

[126] D.I. 21
[127] D.I. 22 at 17.
[128] *Id*.
[129] D.I. 30.
[130] D.I. 166
[131] D.I. 167, 168.

("Sobieski's Motion") on May 6, 2022 as well.[132]  K&A filed its Motion for Summary Judgment ("K&A's Motion") on May 7, 2022, along with two Motions *in Limine* - one relating to Plaintiff's Expert David R. Hoffman, PE and one relating to Plaintiff's Expert Richard Donze, DO.[133]  Those motions *in limine* are resolved in a separate letter opinion issued contemporaneously with this decision (the "*Daubert Letter Opinion*").

## K. Parties' Contentions

Plaintiffs' complaints concerning the Marydale Project's design and execution distill to issues with (i) oversized HVAC units, (ii) leaky ductwork; and (iii) lack of testing and balancing.  Plaintiffs contend the defective design and installation of the HVAC systems caused high relative humidity and resulted in significant mold growth in the tenants' apartments.[134]  According to Plaintiffs, following the mold growth and resulting apartment inspections, every engineer analyzing the cooling capacity of the HVAC units determined they were grossly oversized.[135]  Plaintiffs contend from September 2018, when mold first was

---

[132] D.I. 169.

[133] D.I. 170. Weiner and LNWA joined both of the motions *in limine*. *See* D.I. 173-174. Sobieski likewise joined both motions *in limine*. *See* D.I. 178-179.

[134] Pls.' Br. in Opp. at 4.

[135] *Id*. at 19, Ex. Z.  The ACCA Manual S, published by the Air Condition Contractors of America, guides HVAC equipment sizing.  Manual S states that HVAC heat pump equipment shall satisfy the load requirements at design condition with a total cooling capacity of 95-115%. *Id*. at 20.  The HVAC units installed are oversized by 142-234%. *Id*., Ex. Z at 20. K&A's expert acknowledges ACCA Manual S would inform the design professional's standard of care regarding equipment selection. *Id*., Ex. AA at 86-87.

discovered, to February 2019, the parties discussed leaky ductwork at nearly every weekly meeting and conducting leakage tests, blower door tests and smoke tests, with each test yielding results that illustrated leaky ductwork.[136] Plaintiffs further allege every air flow test performed in the apartments identified a significant deviation in airflow between supply and return; at least two-hundred cubic feet per meter more airflow measured coming from the supply versus the return side.[137] With this differential, the return side will pull air from other sources, through an "envelope" allowing moisture intrusion during periods of high outdoor humidity.[138] Plaintiffs allege they dedicated hundreds of hours and thousands of dollars inspecting apartments for mold growth and professionally remediating the mold found.[139] Lastly, Plaintiffs allege testing and balancing of the HVAC units contractually was required but was not conducted. That testing, Plaintiffs argue, could have identified the issues before construction was complete.[140]

Weiner and LNWA contend the Plaintiffs' access to the Property never was restricted and Plaintiffs never sought to monitor the construction's progress.[141] Those defendants allege the HVAC units were inspected by county agencies, the

---

[136] *Id*. at 21, Ex. Q at 34; 49-51; BB, CC, EE; FF, GG.
[137] *Id*. at 20, Ex. FF; Ex. C at 12-13; Ex. BB, CC.
[138] *Id*. at 21, Ex. D. at 508-509.
[139] *Id*. at 3, Ex. B.
[140] *Id*. at 14, Ex. R.
[141] Weiner and LNWA's Mot. for Summ. J at 10; Vible Dep., 69:9-70:7.

architect, DSHA and Plaintiffs during the construction phase.[142] Weiner and LNWA argue LNWA's responsibilities included having conversations with Plaintiffs to determine what problems were occurring during the Marydale Project's construction and to seek final approval from Plaintiffs for the solutions addressing those problems.[143] But the architect, K&A, was responsible for ensuring renovations and construction specifications complied with contract documents.[144] According to Weiner and LNWA, LNWA's day-to-day work involved reviewing workforce direction and fixing workmanship issues.[145] It was K&A, not the contractor, Weiner and LNWA contend, who signed the payment application and in doing so, confirmed to the owner the work was acceptable and payment should be made.[146] Further, Weiner and LNWA allege Schiavo with K&A coordinated the creation and production of the original design documents.[147]

With respect to design issues, Weiner and LNWA contend the problems cannot be attributed to them. For example, Weiner and LNWA argue the as-installed HVAC systems would have been operational for two to three weeks before construction concluded, and someone would have noticed issues with temperature

---

[142] *Id*. at 17.
[143] *Id*. at 9; Reynolds Dep. 27:6-28:22.
[144] *Id*. at 17.
[145]  *Id*. at 10.
[146] *Id*. at 12.; T. Schiavo Dep. 25:12-21, 39:23-43:3.
[147] *Id*. at 13.

control.[148]  Weiner and LNWA also allege the use of panned ducting "was not a glaring issue" and Plaintiffs did not protest its application during any of the many walk-throughs.[149]  Fully ducted and panned ducting, according to Weiner and LNWA, are acceptable under codes for renovating and new construction.[150]  As for testing and balancing, Weiner and LNWA contend testing and balancing of HVAC units was not required in the Marydale Project because, under the New Castle County Code, only HVAC systems that are installed in commercial spaces or involve "new construction" require testing and balancing.[151]  The renovations to the residential units in the Marydale Project, according to Weiner and LNWA, involved neither a commercial space nor new construction.

Concerning Sobieski, Weiner and LNWA argue Sobieski is liable for failing to install the HVAC systems and associated ductwork in accordance with the contract.[152]  Weiner and LNWA also contend Sobieski contractually was required to defend and indemnify LNWA.[153]

---

[148] *Id*. at 13; Reynolds Dep. 50:8-51:4.

[149] *Id*. at 11. Defendants Weiner and LNWA allege meetings with walk-throughs of the Project were conducted twice a week. *Id*. at 10.

[150] *Id*. at 15; Reynolds Dep. 73:23-74:14; 75:18-76:11.

[151] *Id*. at 13; Reynolds Dep. 44:15-50:7. Defendants Weiner/LNWA argue only the community building of the Marydale Project would require testing as it was the only commercial space and the residential units were not "new construction." *Id*.

[152] Br. in Supp. of Opp. of Third-Party Def. J.F. Sobieski Mechanical Contractors, Inc.'s Mot. for Summ. J. on Third-Party Pl. LNW&A Construction Corp. Inc.'s Third Party Compl. (hereinafter "Br. in Opp. of Sobieski") at 3.

[153] *Id*.

K&A's Motion disputes the facts as the other parties present them. According to K&A, it provided full architectural and engineering design services for the Marydale Project.[154] But unlike "normal construction projects, K&A had no authority" on the Marydale Project "to authorize or approve even minor changes to the work."[155] K&A further points out there were no reports of mold or humidity issues in all of 2017, even after seventy-two residential units were occupied by June of that year.[156]

Lastly, Sobieski contends LNWA's claims that Sobieski's work was performed in an unworkmanlike manner, without due care, or in violation of applicable building codes and construction practices is without factual support.[157] Sobieski also contends LNWA's claim for indemnification fails as a matter of law because the contractual indemnification requirement was not triggered by the pleadings and LNWA has no factual support for implied indemnification.[158] Similarly, Sobieski contends the Subcontract does not impose on Sobieski a duty to defend LNWA.[159]

---

[154] K&A's Br. in Supp. at 6.

[155] *Id*. at 10. K&A alleges all approvals for any changes could only come from Marydale, CME or LNWA.

[156] *Id*. at 17.

[157] Opening Br. in Supp. of Third-Party Def. J.F. Sobieski Mechanical Contractors, Inc.'s Mot. for Summ. J. on Third-Party Plaintiff LNW&A Construction Corp. Inc.'s Third-Party Complaint (hereinafter "Sobieski's Mot.") at 2.

[158] *Id*.

[159] *Id*. at 21.

ANALYSIS

This opinion resolves each of the defendants' summary judgment motions. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits" show "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[160] The movant bears the initial burden of demonstrating its motion is supported by undisputed material facts.[161] If that burden is met, the non-movant then must demonstrate that there is a "genuine issue for trial."[162] To determine whether material facts are in dispute, the Court construes the record in the light most favorable to the non-movant.[163]

Where the parties have filed cross-motions for summary judgment, as is the case for LNWA and Sobieski regarding the third-party complaint, "the standard for summary judgment 'is not altered.'"[164] The mere filing of a cross-motion for summary judgment is not a waiver of a movant's right to assert the existence of a

---

[160] Del. Super. Ct. Civ. R. 56(c).

[161] *Moore v. Sizemore*, 405 A.2d 679, 680 (Del. 1979) (citing *Ebersole v. Lowengrub*, 180 A.2d 467 (Del. 1962)).

[162] Del. Super. Civ. R. 56(e); *see also Brzoska v. Olson*, 668 A.2d 1355, 1364 (Del. 1995) ("If the facts permit reasonable persons to draw but one inference, the question is ripe for summary judgment.").

[163] *Judah v. Del. Tr. Co.*, 378 A.2d 624, 632 (Del. 1977).

[164] *Capano v. Lockwood*, 2013 WL 2724634, at *2 (Del. Super. May 31, 2013) (quoting *Total Care Physicians, P.A. v. O'Hara,* 798 A.2d 1043, 1050 (Del. Super. 2001) (citing *United Vanguard Fund, Inc. v. TakeCare, Inc.*, 693 A.2d 1076, 1079 (Del. 1997))).

factual dispute as to the other party's motion.[165] Even when presented with cross-motions for summary judgment, this Court is not relieved of its duty to deny summary judgment if a material factual dispute exists.[166] Each motion is considered separately, and summary judgment will not be granted if the record indicates a material fact is in dispute or "if it seems desirable to inquire more thoroughly into the facts in order to clarify the application of law to the circumstances."[167]

## I. Allied World's Motion for Summary Judgment is granted as unopposed.

Allied World is the surety on a performance bond secured by LNWA.[168] Under the bond's terms, Allied World's obligation arises after certain events. Those events include: (i) Plaintiffs providing notice to LNW&A Construction Corp. and Allied World that Plaintiffs are considering declaring LNW&A Construction Corp. in default; (ii) Plaintiffs actually declaring LNW&A Construction Corp. in default, terminating the Construction Contract, and notifying Allied World of these actions; and (iii) Plaintiffs agreeing to pay the balance of the contract price in accordance

---

[165] *Capano v. Lockwood*, 2013 WL 272 4634, at *2 (Del. Super. May 31, 2013) (quoting *Total Care Physicians, P.A. v. O'Hara,* 798 A.2d 1043, 1050 (Del. Super. 2001) (citing *United Vanguard Fund, Inc. v. TakeCare, Inc*., 693 A.2d 1076, 1079 (Del. 1997))).

[166] *Fasciana v. Electronic Data Systems Corp.,* 829 A.2d 160, 166 (Del. Ch. 2003).

[167] *Comet Systems, Inc. Shareholders' Agent v. MIVA, Inc*., 980 A.2d 1024, 1029 (Del. Ch. 2008) (quoting *Ebersole v. Lowengrub*, 180 A.2d 467, 470 (Del. 1962)).

[168] Motion of Allied World Insurance Company for Summ. J. (hereinafter "Mot. of Allied World") at ¶ 2., Ex. 2.

with the terms of the Construction Contract to Allied World or to a contractor selected to perform the Construction Contract.[169]

On April 5, 2019, Marydale provided notice to Allied World that it was "considering declaring" LNW&A Construction Corp. in default.[170]  Allied World argues that statement is not enough to trigger its obligation to honor the performance bond commitments because "[a]t no time has the contract between [Marydale] and LNWA been terminated."[171]  Because Plaintiffs never expressly declared LNW&A Construction Corp. in default, Allied World contends its obligation under the performance bond has not arisen.  Plaintiffs did not file any opposition to Allied World's Motion and conceded at oral argument that summary judgment was appropriate.  Allied World's Motion for Summary Judgment therefore is granted.

## II. Weiner and LNWA's Motion for Summary Judgment against Plaintiffs is granted as to punitive damages and fraudulent and/or negligent misrepresentation and concealment, but denied as to Plaintiffs' claims for breach of contract and negligence.

As explained in detail above, three contracts govern Plaintiffs' relationship with Weiner and the LNWA entities: the CME Development Agreement, the Marydale Development Agreement, and the Construction Contract.[172]  Weiner and

---

[169] *Id*., Ex. 2, 3.1-3.3.
[170] *Id*., Ex. 2.
[171] *Id*. ¶ 4.
[172] Once more, (a) the CME Development Agreement bound Plaintiffs with Weiner & Associates; (b) the Marydale Development Agreement bound LNWA Developers, LLC., with Plaintiffs; and (c) the Construction Contract bound LNW&A Construction Corp. with Plaintiffs.

LNWA do not seek summary judgment as to Plaintiffs' breach of contract claims. Rather, Weiner and LNWA contend they are entitled to summary judgment as to Plaintiffs' claims for negligence, fraudulent and negligent misrepresentation or concealment, civil conspiracy, prohibited trade practices and punitive damages.[173] Weiner and LNWA challenge Plaintiffs' proof as to the applicable standard of care, breach, and causation, and Plaintiffs contend there is no record supporting a punitive damages claim. Plaintiffs additionally argue the economic loss doctrine bars Plaintiffs' claims arising in tort.

**A. Weiner and LNWA's Motion as to the economic loss doctrine is denied because the Home Owner's Protection Act applies to Plaintiffs' tort claim.**

Delaware's judicially created economic loss doctrine prohibits recovery in a tort action where a product has damaged only itself and has not caused personal injury or damage to other property.[174] The doctrine arises from the distinct functions served by tort law and contract law.[175] Liability imposed by tort law protects an individual and their property from risk of physical harm, while liability imposed by contract protects a different interest: the "bargained for expectations" of both

---

[173] Weiner and LNWA's Motion did not address Counts II-IV, VI, or VIII. Those Counts correspond to claims for breach of contract, breach of implied warranties of habitability and workmanship, and prohibited trade practices.

[174] *Danforth v. Acorn Structures, Inc.*, 608 A.2d 1194, 1195 (Del. 1992) (citations omitted).

[175] *Id*. (citing *Moorman Mfg. Co. v. National Tank Co.,* 435 N.E. 2d 443, 448 (Ill. 1982)).

contracting parties.[176]  The Delaware Supreme Court has held that "the economic loss doctrine is especially suited to cases where privity of contract" exists.[177]

For the Court to grant judgment in favor or Weiner and LNWA under the economic loss doctrine, the Court first must consider whether the Delaware Home Owner's Protection Act[178] (the "Act") applies to the Marydale Project.  The Act precludes application of the economic loss doctrine in cases involving the construction of residential property.[179]  The General Assembly passed the Act to protect claims arising in "negligence actions in cases involving the construction of residential dwellings."[180]  It follows that if the Court finds the Act applies to the Marydale Project, the economic loss doctrine will not bar the Plaintiffs' tort claims against Weiner and LNWA.[181]

---

[176] *Id*. at 1196.
[177] *Id*. at 1200.  The cases to which the Court was referring were cases involving construction. *Marcucilli v. Boardwalk Builders Inc.,* 1999 WL 1568612, at *4 (Del. Dec. 22, 1999).
[178] 6 *Del. C*. §§ 3601-3603.
[179] 6 *Del. C*. § 3652.
[180] *Casale Construction, LLC v. Best Stucco LLC*, 2014 WL 1316150, at *2 (Del. Super. Mar. 28, 2014) ("This Bill protects home owners by abolishing the economic loss doctrine adopted in *Danforth v. Acorn Structures, Inc.,* Del. Supr., 608 A.2d 1194 (1992) as it applies to actions for negligence in the construction and/or improvement to property used as a residence. The economic loss doctrine prohibits recovery for economic losses caused by the negligent acts of others. Under this Bill, a home owner may recover for such losses. This Bill is intended to apply to any action, regardless of when it occurs, unless otherwise prohibited by law.") (citing 138th General Assembly, House Bill No. 519 (Apr. 24, 1996)).
[181] *See, e.g.*, *Marcucilli v. Boardwalk Builders Inc.,* 1999 WL 1568612, at *6 (Del. Dec. 22, 1999).

In construing and applying an unambiguous statute, the Court's role is to give effect to the plain meaning of the statute's words.[182] Neither side argues the Act is ambiguous, and the Act's plain terms encompass this case. The Act reads:

> No action based in tort to recover damages resulting from negligence in the construction or manner of construction of an improvement to residential real property and/or in the designing, planning, supervision and/or observation of any such construction or manner of construction shall be barred solely on the ground that the only losses suffered are economic in nature.[183]

Weiner and LNWA argue the Act does not apply to the claims against them because the Act was not intended to apply to claims made by a "commercial entity,"[184] like Marydale, or to a multi-unit apartment complex, like the Marydale Project. But this argument finds no support in the statute itself or the cases applying it. Although no court directly has addressed the Act's application to an entity owner of a multi-unit residence, nothing in the Act's terms or in its limited legislative history suggest this Court may or should create out of whole cloth the exception Weiner and LNWA propose to the statute's scope.

Plaintiffs' tort claims allege Defendants' design and installation of oversized HVAC units and ductwork led to the presence of mold in residential apartment units.

---

[182] *Pavulak v. State*, 880 A.2d 1044,1046 (Del. 2005) (citing *Coleman v. State,* 729 A.2d 847, 851 (Del.1999) (citing *Hudson Farms, Inc. v. McGrellis,* 620 A.2d 215, 217 (Del.1993))).
[183] 6 *Del. C.* § 3652.
[184] Defendants use the phrase "commercial entity." It is unclear what they intend to convey with this characterization. To the best of the Court's knowledge, Plaintiffs are both non-profit organizations under the ultimate control of the Catholic Diocese.

Put differently, Plaintiffs are contending they should be permitted to recover for "negligence in the construction or manner of construction" of "an improvement to residential real property." The Act's terms do not limit its application to non-entity owners or to single-unit homes. Instead, the Act broadly uses the words "improvement" and "residential real property." Under the Act, "improvement" includes "buildings . . . and other structures affixed to and on land, as well as any changes to the land itself" and "residential real property" "means any estate in real property improved by a dwelling for use as a residence."[185] The Marydale Project meets these broad definitions. It is an estate in real property and the improvements were made so the property could be used as a residence for elderly and low-income individuals. The improvements included structures affixed to and on the land. The economic loss doctrine therefore does not apply to Plaintiffs' tort claims, and Weiner and LNWA's Motion relying on the Act is denied.

### B. Weiner and LNWA's Motion as to standard of care and breach is denied because Hoffman produced a timely report containing this information.

Weiner and LNWA next contend Plaintiffs' negligence claim fails because Plaintiffs have not identified the standards of care these defendants allegedly breached. This argument rests on Weiner and LNWA's contention that Plaintiffs' expert, Hoffman, did not identify the specific standard of care applicable to Weiner

---

[185] 6 *Del. C.* §§ 3651(2), 3651(3).

and LNWA until Plaintiffs produced a chart[186] (the "December 21st Chart"), which was provided to Defendants after Plaintiffs' expert report deadline had passed. The record contradicts this characterization. Hoffman produced a timely 76-page report[187] (the "Hoffman Report") that identified his opinions concerning both the standards of care and associated breaches with respect to the Marydale Project. His opinions are sufficient to support a claim of negligence. Although the Hoffman Report does not expressly use the phrase "standard of care," the report makes it clear he is opining as to the standards (i) the defendants should have met; and (ii) how their conduct fell short.[188] The December 21st Chart was produced in advance of Hoffman's deposition and simply summarized the opinions set forth in his report. It is plain from the record that Plaintiffs timely disclosed their expert's opinion regarding both the standard of care and breach necessary for a negligence claim to survive a motion for summary judgment.[189]

---

[186] K&A's Mot., Ex. 40.

[187] Pls.' Br. in Opp., Ex. C.

[188] *See, e.g.*, Pls.' Br. in Opp., Ex. C. Table #1 at 7 ("The installed split system heat pumps cannot maintain these indoor conditions indicated as the 'Basis of Design' because the same have no way of measuring space humidity and therefore during both full load and especially during part load conditions the same is not capable of limiting the space relative humidity to 50%.") *See also,* "We did not observe duct lining on the return air duct to within 5 feet of the indoor air handling units. This should be provided at all units to comply with the Contract Documents." *Id.* "Volume dampers are not installed on any of the return air grilles and are only installed within the registers for the supply air ducts. Volume dampers are critical for allowing an HVAC system to be tested and balanced…" *Id.* Table #2 at 8.

[189] The defendants challenged Hoffman's opinion on other bases in a *Daubert* motion. Those additional arguments are addressed and rejected in the Court's letter opinion addressing the defendants' *Daubert* motions.

**C. Weiner and LNWA's Motion as to causation is denied because there are factual issues concerning causation that must be resolved at trial.**

As to Weiner and LNWA's argument that Plaintiffs have not provided evidence of causation sufficient to sustain a negligence claim, the Court disagrees. In summary, Plaintiffs allege improperly designed HVAC systems and leaky ductwork led to high levels of relative humidity in the residential units. Their position is supported by evidence in the record, thereby confirming the existence of a factual dispute regarding causation. Among the evidence Plaintiffs cite is (i) testimony by Brightfields to the effect that oversized units and short cycling was a possible cause of heightened humidity and, therefore, mold growth; (ii) testimony by Harry Neill, an industrial hygienist expert who opined the design, installation, operation and/or maintenance of the HVAC systems played a critical role in causing or contributing to high humidity conditions; and (iii) complaints by the residents regarding humidity and mold in their residences. As explained in the *Daubert* Letter Opinion, when forming his opinion, Hoffman is entitled to rely on testing by others, including reports of high-humidity conditions in the units and the presence of mold on personal property. Contrary to Weiner and LNWA's position, Hoffman's temporary fix and the fact that some residential units still experienced mold following the fix does not disprove causation. As indicated, the fix was temporary and only addressed short-cycling concerns, not leaky ductwork.

**D. Weiner and LNWA's Motion as to Plaintiffs' claims of fraudulent and/or negligent misrepresentation and concealment is granted because Plaintiffs have not provided evidence of reliance or wrongfulness.**

Next, Weiner and LNWA seek summary judgment as to Plaintiffs' claims of fraudulent and/or negligent misrepresentation and concealment. Although Plaintiffs resist summary judgment as to these claims, Plaintiffs do not plainly articulate their theory with respect to these claims or point to record evidence to support any such theory. Plaintiffs neither discuss the elements necessary to prove these claims nor cite evidence in the record that would satisfy those elements.[190] This alone is enough to award summary judgment to Defendants as to these claims.[191] For the sake of a complete analysis, however, the Court briefly will discuss the absence of any identified proof with respect to these claims.

Fraudulent concealment is an intentional nondisclosure of material facts by one who owes a duty to disclose; typically, the defrauding party has knowledge of the facts they are concealing.[192] A valid claim for fraudulent concealment requires that a plaintiff demonstrate the defendant engaged in an "affirmative act of concealment" that "put the plaintiff off the trail of inquiry," preventing them "from gaining knowledge of the facts."[193] Put simply, a fraudulent concealment claim must

---

[190] *See* Pls.' Br. in Opp. at 30-31.
[191] *Broska*, 668 A.2d at 1364.
[192] *Allen v. Layton*, 235 A.2d 261, 264 (Del. Super. 1967).
[193] *Washington House Condominium Ass'n of Unit Owners v. Daystar Sills, Inc.,* 2017 WL 3412079, at * 18 (Del. Super. Aug. 8, 2017) (citing *In re Dean Witter P'ship Litig.*, 1998 WL 442456, at *5 (emphasis added)).

adequately plead (i) actual knowledge of wrong done, or (ii) an affirmative act to conceal facts from the plaintiff.[194] As an example, the Court in *Nardo v. Guido DeAscanis & Sons, Inc.,*[195] held a claim of fraudulent concealment failed where the plaintiff produced no facts indicating roof rafters were improperly placed with fraudulent intent to conceal such a fact from the owner, or that there was ever any affirmative act of concealment by the builder.[196] The difference between negligent and fraudulent concealment is that "allegations of scienter and of a positive act of concealment are generally necessary" to establish fraudulent concealment but are not required for negligent concealment.[197]

To maintain a claim for fraudulent misrepresentation, on the other hand, a plaintiff must demonstrate (i) the defendant made a false representation; (ii) the defendant knew or believed that representation was false or made it with reckless indifference to the truth; (iii) the false representation was intended to induce the plaintiff to do or not do something; (iv) the plaintiff's action or inaction was taken

---

[194] *Layton v. Allen*, 246 A.2d 794,798 (Del. 1968) (superseded by statute as acknowledged in *GI Associates of Delaware, P.A. v. Anderson*, Del. Super. Feb. 15, 2021). *But see Krahmer v. Christie's Inc.,* 903 A.2d 773, 780 (Del. Ch. 2006) ("After the *Layton* decision was rendered, the Delaware General Assembly enacted 18 *Del. C.* § 6856, which restricted the court's holding in medical malpractice cases. However, *Layton* remained good law as applied in other contexts.") (internal citations omitted).

[195] 254 A.2d 254 (Del. Super. 1969).

[196] *Nardo v. Guido DeAscanis & Sons, Inc*., 254 A.2d 254, 256 (Del. Super. 1969)

[197] *Allen v. Layton*, 235 A.2d 261, 265 (Del. Super. 1967). Delaware has adopted the reasoning behind the following cases concerning negligent concealment and fraudulent concealment: *Guy v. Schuldt,* 138 N.E.2d 891, 895 (1956); *Rosane v. Senger,* 149 P.2d 372 (1944); and *Hinkle v. Hargens,* 81 N.W.2d 888 (1957).

in justifiable reliance upon the representation; and (v) the plaintiff was damaged by their reliance.[198] To support a negligent misrepresentation claim, the plaintiff must show (i) the defendant had a duty to provide the plaintiff with accurate information; (ii) the defendant gave the plaintiff false information; (iii) the defendant failed to exercise reasonable care in obtaining or communicating information; and (iv) the plaintiff suffered a pecuniary loss caused by justifiable reliance upon the false information.[199]

Nothing in the record would meet Plaintiffs' burden of proof with respect to these concealment or misrepresentation claims. Following the discovery of mold in the residential units, the parties to this action worked together to identify the cause and find a solution. Plaintiffs do not present evidence to the contrary; nothing in the record establishes Weiner or LNWA acted to prevent Plaintiffs from knowing any fact that would be of value to addressing mold concerns. Further, none of the choices Weiner or LNWA made were a "wrong done;" although their design or construction choices did not align with the Marydale Project's dimensions, this was

---

[198] *Oglesby v. Conover*, 2011 WL 3568276, at *3 (Del. Super. May 16, 2011)(citing *Carrow v. Arnold*, 2006 WL 3289582 at *8 (Del. Ch. Oct. 31, 2006)).

[199] *Smith v. Peninsula Adjusting Co., Inc.,* 2011 WL 2791252, at *3 (Del. Super. June 16, 2011) citing *Atwell v. RHIS, Inc.,* 2006 WL 2686532 (Del. Super. Aug. 18, 2006); *see also Outdoor Techs., Inc. v. Allfirst Fin., Inc.,* 2001 WL 541472 (Del. Super. Apr. 12, 2001).

a construction error, rather than the "wrongfulness" necessary for a fraudulent concealment claim.

Further, the only evidence Plaintiffs have put forth regarding any intentional or knowing misrepresentation by Weiner and LNWA relates to the use of panned ducting. But as to that representation, there is no evidence of reliance by Plaintiffs, which is necessary to maintain a negligent or fraudulent misrepresentation claim. Plaintiffs in this case have not come forward with any disputed issues of material fact from which a fact finder could conclude Plaintiffs relied upon a purported misrepresentation from Weiner and LNWA. Accordingly, Weiner and LNWA's Motion is granted as to Plaintiffs' claims for fraudulent and negligent misrepresentation and concealment.

### E. Weiner and LNWA's Motion as to punitive damages is granted because Plaintiffs have not produced evidence of egregious conduct.

Finally, Weiner and LNWA's Motion asks this Court to grant them judgment as a matter of law concerning Plaintiffs' claim for punitive damages. Punitive damages, which serve as a deterrent against future wrongful conduct, are appropriate when the record supports a conclusion that the defendant acted in a reckless and egregious manner.[200] Without "evidence of egregious conduct of an intentional or

---

[200] *Roberts v. Delmarva Power & Light Co*. 2 A.3d 131, 145 (Del. Super. 2009) (citations omitted). *See also Jardel Co., Inc. v. Hughes*, 523 A.2d 518, 528 (Del. 1987) "[P]unitive damages implicate other societal policies. Though the injured plaintiff may receive the punitive damage award, to the extent the plaintiff has already been fully compensated. By actual damages an award of punitive damages is, in a real sense, gratuitous." (citations omitted.).

reckless nature" in the record, a claim for punitive damages cannot survive.[201] Where a defendant's conduct, although unintentional, has been "particularly reprehensible, *i.e.* reckless, or motivated by malice or fraud," punitive damages may be sought.[202]

Plaintiffs have not produced evidence of willful, fraudulent, malicious, or reckless conduct by Weiner or LNWA. Plaintiff's own opposition brief is vague concerning its support for punitive damages against Weiner and/or LNWA. Consuming little more than a page of Plaintiffs' brief, the argument contains no citations to specific evidence in the record revealing such conduct. When pressed by the Court at oral argument for evidence supporting their punitive damages claim, Plaintiffs argued (i) no work change order was issued concerning the ductwork change; (ii) LNWA ignored the contractual requirement for testing and balancing the HVAC units; (iii) Weiner and LNWA ignored written correspondence regarding the use of panned ductwork; and (iv) the "as-built" drawings of the Marydale Project did not show the use of panned ductwork. But at most, these factual issues could establish negligence or breach of contract. Nothing in the record Plaintiffs cite evinces malice, fraud or willful breach of contract that would permit a jury to award punitive damages against Weiner and LNWA. Although Plaintiffs' brief focuses on

---

[201] *Jardel Co., Inc. v. Hughes*, 523 A.2d at 529.
[202] *Id*.

Marydale's vulnerable population and their exposure to a microscopic fungus, that argument does not address whether or how Defendants' alleged conduct met the punitive damages standard. Weiner and LNWA's Motion as to Plaintiffs' punitive damages claim therefore is granted.

## III. K&A's Motion is granted as to Plaintiffs' breach of contract and punitive damages claims and denied as to the negligence claim.

The Architect Agreement sets forth K&A's contractual obligations to Plaintiffs. Plaintiffs' claims against K&A include the following: negligence, breach of contract, fraudulent or negligent misrepresentation or concealment, civil conspiracy, prohibited trade practices, and punitive damages.[203] But at oral argument, Plaintiffs confirmed they were not pursuing claims for fraudulent or negligent misrepresentation or concealment, prohibited trade practices, or civil conspiracy against K&A. Those claims therefore are dismissed from this action.

### A. K&A's Motion is granted as to Plaintiffs' breach of contract claim because Plaintiffs have failed to point to the contractual provision allegedly breached.

K&A contends Plaintiffs have failed to state a negligence claim or a breach of contract claim against it because no evidence in the record points to K&A breaching a specific duty or facts indicating such a breach was the proximate cause

---

[203] Those claims correspond to the following counts in the Amended Complaint: Count I (Negligence); Count V (Breach of Contract); Count VII (Fraudulent and/or Negligent Misrepresentation and Concealment); Count VII (Civil Conspiracy); Count VIII (Prohibited Trade Practices); and Count IX (Punitive Damages). Compl. at 21-33.

of mold growth found in the apartment units. Specifically, K&A argues Plaintiffs' expert failed to articulate what K&A's contractual or common law duty was or how it was breached. In response, Plaintiffs continued to allege a breach of contract claim against K&A but did not identify a single contractual provision allegedly breached. Instead, Plaintiffs ask this Court to consider the Architect Agreement as a whole when evaluating Plaintiffs' breach of contract claim against K&A.

This is not how Delaware courts address breach of contract claims. Under Delaware law, simply referring generally to the parties' contract will not sustain a claim for breach of contract.[204] A party must identify the particular contractual terms that were breached. K&A propounded interrogatories asking Plaintiffs to identify the contractual provisions K&A purportedly breached, but Plaintiffs did not do so. Instead, Plaintiffs responded to K&A's interrogatories by copying and pasting paragraphs 37-45 from their Complaint.[205] Similarly, Plaintiffs did not identify a single applicable contractual provision in their opposition brief or during oral argument. In essence, Plaintiffs contend they can prove a breach of contract because a contract governed K&A's work and damages resulted from that work. That *ipse*

---

[204] *See, e.g., BET FRX LLC v. Myers*, 2022 WL 1236955, at *1 (Del. Ch. Apr. 27, 2022) ("The plaintiff's claims for breach of the express and implied terms of the LLC agreement fail because the plaintiff fails to identify any express or implied terms allegedly breached."). *See also*, *id*. at *4 ("Plaintiff…admit(s) that the Amended Complaint does not expressly identify a provision of the LLC Agreement allegedly breached. This deficiency is typically fatal.") (citations omitted).

[205] *Compare* Plaintiffs Marydale Preservation Associates, LLC and Catholic Ministry to the Elderly, Inc. Responses to Defendant Kitchen and Associates Services, Inc. First Set of Interrogatories Directed to Plaintiffs, ¶47 Answ. *with* Compl. ¶¶ 37-45.

*dixit* does not satisfy Plaintiffs' burden in the face of a dispositive motion. It is not incumbent on the Court to search through the contract for terms that might have been breached. Accordingly, the Court awards K&A summary judgment as to the breach of contract claim against it.

## B. K&A's Motion is denied as to Plaintiffs' negligence claim because factual disputes exist concerning K&A's design and installation of the HVAC systems.

As to the negligence claim against K&A, Plaintiffs and their expert, Hoffman, have identified K&A's purported duties and breaches in the design process.[206] According to Hoffman, K&A was obligated to design an HVAC system appropriate for the allotted space and consistent with the basis for that design. Hoffman identifies multiple ways in which K&A failed to appropriately design the HVAC system.[207] K&A's design called for York LX Series units, which were oversized for the space per ACCA Manual S.[208] The use of an oversized unit, Hoffman opines, led to short cycling and high relative humidity. The record evidence, although disputed, is sufficient to allow a jury to conclude that K&A breached its duty and caused damage to the Plaintiffs, including harm to property and the need to take remedial measures. K&A's Motion as to the negligence claim therefore is denied.

---

[206] *See supra* note 188.
[207] Pls.' Br. in Opp., Ex. C; K&A's Mot., Ex. 40.
[208] *See supra* note 135.

## C. K&A's Motion as to punitive damages is granted.

Plaintiffs confirmed during oral argument that they are not pursuing a punitive damages claim as to K&A. K&A's Motion as to that claim therefore is granted.

## IV. LNWA and Sobieski's Cross-Motions are denied because there are disputed material facts concerning the third-party complaint.

LNWA and Sobieski are parties to the Subcontract and each filed summary judgment motions against the other. None of the arguments raised in those motions supports entry of judgment as a matter of law.

### A. LNWA's Cross-Motion as to Sobieski's procurement of insurance is denied because disputed issues of fact exist concerning this obligation.

LNWA argues it is entitled to summary judgment as to Sobieski's breach of its contractual obligation to procure insurance naming LNWA as an insured.[209] But disputed issues of fact exist concerning this claim. The record contains different versions of an insurance certificate, and it is unclear to the Court at this time which one is the operative certificate as to these parties. The jury's resolution of that factual issue will resolve whether Sobieski met its obligation to procure insurance. The Court therefore denies LNWA's Cross-Motion on that issue.

---

[209] Mot. of LNW&A Construction Corp., Inc. for Summ. J. on Third-Party Compl. Against J.F. Sobieski Mechanical Contractors, Inc. ¶ 4.

**B. LNWA's Cross-Motion as to Sobieski's breach of its duty to defend is denied because no such contractual obligation exists in the Subcontract.**

LNWA also argues it is entitled to summary judgment regarding Sobieski's breach of its purported duty to defend. But the Court has not found, and LNWA has not identified, any express "duty to defend" language in the Subcontract. The Subcontract's indemnification clause reads, in pertinent part:

> To the fullest extent permitted by law, the Subcontractor shall indemnify and hold harmless the Owner, Contractor, Architect, Architect's consultants, and agents and employees of any of them from and against claims damages, losses and expenses, including but not limited to attorney's fees, arising out of or resulting from performance of. The Subcontractor's Work under this Subcontract, provided that any such claim, damage, loss or expense is attributable to bodily injury, sickness, disease or death, or to injury to or destruction of tangible property (other than the Work itself) . . . [210]

A "duty to defend" is a contractual obligation that is distinct from a "duty to indemnify."[211] A duty to defend generally is broader than a duty to indemnify and requires the obligor to pay the costs of defending the obligee against a particular type of claim.[212] In contrast, a duty to indemnify arises if an underlying claim is successful.

LNWA acknowledges the Subcontract does not expressly refer to a duty to defend. LNWA nevertheless argues *Pike Creek Chiropractic v. Robinson*[213]

---

[210] Subcontract Agreement, Indemnification, § 4.6.1.
[211] *Liggett Group Inc. v. Affiliated FM Ins. Co.*, 2001 WL 1456995, at *2 (Del. Super. Sept. 12, 2001).
[212] *Id.* at *3.
[213] 637 A.2d 418 (Del. 1994).

supports the proposition that the Subcontract's "hold harmless" language must encompass something broader than the duty to indemnify and therefore must create a duty to defend. But that case does not support the proposition that "hold harmless" language in an indemnification clause is equivalent to a duty to defend. To the contrary, in that case the Delaware Supreme Court held that language requiring the indemnitor to hold an indemnitee harmless against "any liabilities and expenses, including attorney's fees" meant the indemnitor was required to pay the attorneys' fees the indemnitee incurred in enforcing the indemnification clause.[214] The phrase "duty to defend" appears only once in *Pike Creek Chiropractic* and that is in the factual background portion of that case.

In short, there is no contractual duty to defend in the Subcontract. Settled case law indicates a duty to indemnify arises at the conclusion of litigation.[215] If LNWA succeeds in its indemnification claim, it also may be entitled to the attorneys' fees it incurred to bring that claim, consistent with the Subcontract's "hold harmless" clause and *Pike Creek Chiropractic*. But LNWA has not pointed to any contractual obligation requiring Sobieski to advance defense costs during the pendency of the proceeding. Accordingly, LNWA's Motion is denied as premature.

---

[214] *Pike Creek Chiropractic*, 637 A.2d at 422-23. In other contexts, this is called "fees on fees" or "fees for fees."

[215] *Mine Safety Appliances Company v. AIU Insurance Company*, 2015 WL 5829461, *6 (Del. Super. Aug. 10, 2015).

**C. Sobieski's Cross-Motion is denied because whether an "injury" to "tangible property" has occurred is a factual dispute for the jury to resolve.**

Sobieski argues it is entitled to summary judgment regarding LNWA's indemnification claim against it because, contrary to LNWA's position, the Subcontract's indemnification clause has not been triggered. Sobieski contends Plaintiffs in this case have made no claim for bodily injury, sickness, disease or death, or for injury to or destruction of tangible property, and such a claim is necessary to trigger an indemnification obligation under the Subcontract. But the record is otherwise. Plaintiffs made a claim against LNWA for injury to "tangible property." According to Plaintiffs, as a result of Defendants' negligence, Plaintiffs had to address "injury" to their residents' personal property, including the costs to clean and replace personal effects due to mold growth. The jury will determine whether Plaintiffs successfully prove this injury. Whether such an "injury" to "tangible property" occurred as a result of Defendants' conduct will determine Sobieski's indemnification obligations, but the Court cannot resolve that factual question on the record before it.

**D. Sobieski's Cross-Motion as to liability is denied because expert testimony has identified factual disputes regarding Sobieski's failure to perform in accordance with the Subcontract.**

Lastly, Sobieski argues it is entitled to summary judgment regarding liability because there is no factual support for LNWA's claim that Sobieski's work was

50

performed in an unworkmanlike manner, without due care, and in violation of applicable codes and practices. But both Plaintiffs and LNWA have identified expert opinions and factual record support for their contention that Sobieski was negligent or failed to perform in accordance with the Subcontract. First, Sobieski concedes it did not test and balance the HVAC equipment after installation. Plaintiffs contend this obligation existed in contract.[216] LNWA argues that if there was a contractual obligation to test and balance the HVAC systems after installation, it was Sobieski's responsibility and not LNWA's. Second, Plaintiffs' and LNWA's experts identified evidence of leaky ductwork installed in the units, and ductwork was Sobieski's responsibility. These disputed facts and whether Sobieski ultimately is responsible for problems resulting from the Marydale Project's construction are issues for trial. Sobieski's Cross-Motion for Summary Judgment therefore is denied.

## CONCLUSION

For the foregoing reasons, (i) Allied World's Motion is **GRANTED** as unopposed; (ii) Weiner and LNWA's Motion is **GRANTED** as to fraudulent and/or negligent misrepresentation and concealment and punitive damages and **DENIED** as to negligence; (iii) K&A's Motion is **GRANTED** as to breach of contract and

---

[216] LNWA disputes the presence of the obligation within the contract but did not move for summary judgment on this point.

punitive damages and **DENIED** as to negligence; (iv) LNWA's Cross-Motion is **DENIED**; and (v) Sobieski's Cross-Motion is **DENIED.**

   **IT IS SO ORDERED.**